**Howard M. LASKER and Irving Goldberg, Plaintiffs,**

v.

**Harry G. BURKS, Jr., et al., Defendants.**

**No. 73 Civ. 552 (HFW).**

United States District Court,
S. D. New York.

Jan. 7, 1977.

---

Aranow, Brodsky, Bohlinger, Benetar & Einhorn, New York City, by Anthony L.Tersigni, Herbert A. Einhorn, David J. Sweet, Steven Mallis, New York City, of counsel, for plaintiffs.

Seward & Kissel, New York City, for defendant Fundamental Investors, Inc.

Pollack & Kaminsky, New York City, for defendants Anchor Corp., Burr, Chalker, Haire & Hutchinson.

Dewey, Ballantine, Bushby, Palmer & Wood, New York City, for defendants Burks, Hopkins, Kemmerer, Monroney, Phillips and Wade.

## OPINION

WERKER, District Judge.

This action, brought derivatively by two shareholders on behalf of Fundamental Investors, Inc. ("Fundamental" or the "Fund"), a registered investment company, seeks to recover damages resulting from the Fund's purchase of $20 million in 270-day notes issued by the now bankrupt Penn Central Transportation Company. The defendants are Anchor Corporation ("Anchor"), the registered investment adviser to the Fund, and several past and present members of the Fund's Board of Directors ("Board"). The defendants previously moved to dismiss this suit under Rule 12(b) of the Federal Rules of Civil Procedure because a voting quorum of disinterested directors found, in the exercise of its business judgment, that maintenance of the suit would not be in the best interests of the shareholders of the Fund. In a memorandum decision on that motion, 404 F.Supp. 1172, this court held that the business judgment rule[1] applied to the actions of the

---

1. Under the rule,

"'. . . Questions of policy of management, expediency of contracts or action, adequacy of consideration, lawful appropriation of corporate funds to advance corporate interests, are left solely to their honest and unselfish decision, for their powers therein are without limitation and free from restraint, and the exercise of them for the common and general interests of the corporation may not be questioned, although the results show that what they did was unwise or inexpedient.' *Politz v. Wabash R. Co.*, 207 N.Y. 113, 124, 100 N.E. 721, 724. Indeed, although the concept of 'responsibility'

Fund and that it enabled the minority directors of the Board to seek dismissal of this suit provided only that they were "truly disinterested and independent." However, the court permitted the plaintiffs to conduct discovery for a designated period of time to determine whether the minority directors were in fact disinterested or independent, and the motion to dismiss was denied without prejudice to renew at the close of discovery. In accordance with that decision, the defendants have now renewed their motion to dismiss the instant action. The plaintiffs continue to argue that the motion should be denied because, for various reasons, the minority directors did not, and could not, exercise their independent business judgment in moving to terminate this action.

### I

The facts surrounding this action have been described at length in my earlier memorandum decision; nevertheless, some repetition of that discussion will facilitate an understanding of the court's action upon the present motion by the defendants.

The complaint alleges, among other things, that Anchor breached its statutory, contractual and common law fiduciary duties by relying exclusively upon the representations of *Goldman, Sachs & Co.* (a seller of commercial paper), rather than independently investigating the quality and safety of the Penn Central 270-day notes purchased by the Fund. It is further alleged that the defendant directors knew or should have known of Anchor's failure to meet its responsibility; that they violated their common law duties as corporate fiduciaries by acquiescing in Anchor's omissions; that the financial condition of the Penn Central steadily worsened during the period from November 28, 1969 to June 21, 1970, the date that it filed for reorganization; and that during this period of decline all of the defendants failed to investigate and review the financial condition of the Penn Central and the quality and safety of its commercial paper. It is also alleged that during this period Anchor failed to recommend, and the defendant directors failed to attempt, sale of the Penn Central paper held by the Fund.

Prior to the institution of this action, the Fund and other plaintiffs brought suit against *Goldman, Sachs* seeking rescission of their purchases. *See Welch Foods, Inc. v. Goldman, Sachs & Co.*, 398 F.Supp. 1393 (S.D.N.Y. 1974) (the "*Welch*" action). On the motion of all defendants to this action, Judge Gurfein, then a district court judge, granted a stay of further proceedings in this action pending resolution of the Fund's claims in *Welch*. Thereafter, on July 9, 1974 the Fund agreed to settle its claims against *Goldman, Sachs*. Under the terms of the settlement agreement, *Goldman, Sachs* was to take back the notes and the Fund was to receive $5,250,000 in cash and a 73.75 percent interest in any proceeds of the notes obtained during the course of the Penn Central reorganization proceeding.

With the claims of Fundamental in the *Welch* matter resolved, the Board once again faced the question of what to do in the instant action. Briefly, the Board determined that five of its members were disinterested (the "disinterested quorum" or "minority directors") and therefore able to determine the proper course of action for the Fund.[2] The disinterested quorum then retained the Honorable Stanley H. Fuld, former Chief Judge of the New York Court of Appeals, to review the circumstances surrounding the purchase and retention of the Penn Central notes and prepare an opinion for its consideration. In a memorandum to the disinterested quorum dated December 5, 1974, Judge Fuld concluded that neither Anchor nor the defendant directors of the

is firmly fixed in the law, it is only in a most unusual and extraordinary case that directors are held liable for negligence in the absence of fraud, or improper motive, or personal interest." *Bayer v. Beran*, 49 N.Y.S.2d 2, 6 (Sup.Ct. 1944).

2. Under Article Eight of the Certificate of Incorporation of Fundamental, a quorum of the Board may not be less than one-third of the total number of directors. Since the full Board consisted of ten members, there was no problem here.

Fund had violated the law "in connection with the acquisition or retention of the Penn Central commercial paper." Judge Fuld's memorandum discussed several positions that the disinterested quorum could take on behalf of the Fund, one of which was concluding that the suit lacked merit and moving to dismiss. The minority directors met with Judge Fuld at a special meeting of the disinterested quorum held on December 18, 1974 and requested that he submit a further memorandum before they took any action. The minority directors also questioned several of the defendants before deciding at a second special meeting of the disinterested quorum, held on January 6, 1975, to seek dismissal of the instant action.[3] An affidavit submitted by the chairman of the disinterested quorum as part of the earlier motion to dismiss recounts ten factors that the disinterested quorum considered in arriving at its decision. The relevant portion of that affidavit appears in my earlier decision, 404 F.Supp. at 1176–77.

## II

On the defendants' initial motion to dismiss, this court considered and rejected the contention of the plaintiffs that the merits of their derivative claim should color the court's consideration of the business judgment "defense." The court also reviewed the claim of the plaintiffs that the strong public policy behind the Investment Company Act of 1940, 15 U.S.C. § 80a–1, et seq., and the Investment Advisers Act of 1940, 15 U.S.C. § 80b–1, et seq., precluded application of the business judgment rule to the actions of mutual funds. The court observed that

"absent a statutory exception whether a cause of action is expressly authorized or is 'implied' the directors of a corporation should be given the chance to perform their duties in running the business of the corporation, including whether to prosecute a cause of action. 404 F.Supp. at 1180.

Both of these contentions have been reasserted in substantially unchanged form in the plaintiffs' papers in opposition to the renewed motion to dismiss. While a certain degree of tenacity is the mark of accomplished counsel, what the plaintiffs now seek is an opportunity to reargue the court's prior decision after the time to do so has passed. To accede to that request would require the court to reconsider arguments previously rejected without having been shown that there is a need to do so. Consequently, the court will only consider the question it did not reach before: whether the minority directors were disinterested and independent.

■ Since the parties have each submitted affidavits and excerpts from the extensive deposition testimony to assist in the disposition of the instant motion, the court must treat the motion as one for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. Rule 12(b), Fed. R.Civ.P.

## III

The plaintiffs first contend that the structure of the mutual fund industry, which subjects mutual funds to extensive control by their investment advisers, precludes a finding of independence in this instance.[4] Specifically, they maintain that the large number of shareholders in the Fund coupled with the small size of each

3. As was noted in my earlier decision in this matter, although one of the five minority directors voted by proxy, even without her vote, the presence of four directors at the meeting constituted a quorum.

4. In this regard, plaintiffs note Chief Judge Kaufman's recent statement that:
"The relationship between investment advisers and mutual funds is fraught with potential conflicts of interest. The typical fund ordinari-ly is only a shell, organized and controlled by a separately owned investment company adviser, which selects its portfolio and administers its daily business. Compensation for these services is determined under an advisory contract, the terms of which are all too often dictated to unwary or negligent fund directors and fund shareholders by the investment adviser." *Galfand v. Chestnutt Corp.*, Civ. No. 76–7156 (S.D. N.Y. Nov. 4, 1976).

shareholder's interest, makes proxy contests impossible to wage and ensures that the Board will only contain directors amenable to the policies of the Fund's management.[5] The plaintiffs also suggest that the service of each minority director for compensation on the boards of other "Anchor" funds demonstrates their inability to act independently. In this vein, the plaintiffs maintain that business and personal relationships among the defendants and minority directors make it impossible to conclude that the disinterested quorum acted independently; that even if the minority directors acted in good faith, their loyalties must have been divided.

■ Plaintiffs have not adduced any factual support for their conclusion that the members of the disinterested quorum acted other than independently. Although each of the minority directors knew someone on the Board at the time that he or she was nominated, the relationships which existed between the minority directors and the defendant directors were de minimis, even as they are stated by the plaintiffs, and do not suggest that the business judgment rule should not be applied.

■ There is also no reason to conclude that the business judgment rule is inapplicable merely because each minority director receives remuneration for service on the boards of other "Anchor" funds. Most corporate directors receive some compensation for their services, but absent a showing of improper motive they have always been permitted to apply their business judgment to decisions involving derivative suits brought against the corporations they serve. See, e. g., Warshaw v. Calhoun, 43 Del.Ch. 148, 221 A.2d 487 (Sup.Ct.1966). I am not persuaded that there is any meaningful distinction between remuneration by one corporation rather than several corporations similar in structure. This is not, after all, an instance where it is alleged that a minority director received payments from the investment adviser or other persons whose interests conflict with those of the Fund.

■ The plaintiffs' contention that a minority director of a mutual fund can never act independently given the relationship between mutual funds and their advisers parallels, to some extent, their previously rejected argument that the business judgment rule should not apply to mutual funds registered under the Investment Company Act of 1940. In making this claim, plaintiffs apparently rely upon Fogel v. Chestnutt, 533 F.2d 731 (2d Cir. 1975), cert. denied, 429 U.S. 824, 97 S.Ct. 77, 50 L.Ed.2d 86 (1976), but that decision is inapposite. In the Fogel case, two mutual fund stockholders brought a derivative suit on behalf of a mutual fund against several affiliated fund directors and the advisor to the fund. The plaintiffs sought to recapture a portion of the brokerage commissions paid on fund transactions on the theory that the affiliated directors had "intentionally misled and misinformed the [f]und's unaffiliated directors by telling them that such recapture was not available to the [f]und." Id. at 737.

Writing for the Fogel panel, Judge Friendly observed that:

"Congress had mandated independent directors in order 'to supply an independent check on management and to provide a means for the representation of shareholder interests in investment company affairs.' [citation omitted]. The minimum requirement to enable the [f]und's independent directors to discharge these duties with respect to recapture was a careful investigation of the possibilities performed with an eye eager to discern them rather than shut against them, and, if these possibilities were found to be real, a weighing of their legal difficulties and their economic pros and cons. It would have been still better to have the investigation of recapture methods and their legal consequences performed by

---

5. At about the time that the minority directors determined to seek the dismissal of this action, there were approximately 141,000 shareholders in the Fund. No shareholder had a beneficial interest greater than one percent.

disinterested counsel furnished to the independent directors."

*Id.* at 749–50.

Significantly, Judge Friendly went on to observe that:

"If this had been done and the independent directors had concluded that, because of legal doubts, business considerations or both, the [f]und should make no effort at recapture, we would have a different case."

*Id.* at 750.

In the instant action, the minority directors were furnished with disinterested counsel who analyzed the legal consequences of each alternative available to the disinterested quorum. Moreover, the affidavit of the quorum chairman and the minutes of the special meetings indicate that the minority directors acted only after they had fully considered the options available to them. Clearly, then, under *Fogel* it was proper for them to determine what the Fund's posture would be.

## IV

The plaintiffs next contend that the lack of true independence and disinterestedness on the part of the minority directors is apparent from the manner in which they decided to seek dismissal in the instant action. In support of this claim, plaintiffs point to the actions of Roger T. Wickers, an Anchor vice-president who formerly served as the secretary to the Fund, and Eugene P. Souther, who was retained as special counsel to the Fund for the purposes of this litigation, as well as to the circumstances surrounding the meetings of the minority directors.

At the direction of defendant Haire, Wickers explored the possibility of retaining special counsel for the disinterested quorum. After contacting several distinguished attorneys, Wickers reported that Judge Fuld would be available to serve the minority directors and, at a Board meeting held on July 24, 1974, it was Wickers who proposed that a disinterested quorum act for the Fund in the instant action. Wickers also coordinated the arrangements for Judge Fuld's investigation for the minority directors, who were residents of several different states.

The plaintiffs maintain that "the inappropriateness of Wickers role as intermediary is manifest," but I disagree. The plaintiffs have not set forth any facts in support of their suggestion that Wickers improperly influenced the deliberations of the disinterested quorum. Instead they have engaged in totally unsubstantiated supposition. For example, plaintiffs contend that Wickers retained Judge Fuld, but the sworn affidavit of Wickers and the deposition of a least one minority director establish that Judge Fuld was retained by the minority directors to act upon instructions communicated to him at the direction of the disinterested quorum.[6] In the absence of some factual support for the plaintiffs' allegations, the court cannot conclude that it was improper for Wickers to coordinate the administrative details of Judge Fuld's inquiry or that Wickers' actions reduced the independence of the minority directors.

It is the court's opinion that the role of Souther was equally innocent. The plaintiffs advance two reasons why it was inappropriate for him to participate as he did in the deliberations of the disinterested quorum. First, they note that he was an "interested person" within the meaning of § 2 of the Investment Company Act, 15 U.S.C. § 80a–2(a)(19)(A)(iv)[7] because his

---

**6.** Even if Wickers did retain Judge Fuld for the minority directors, I see nothing improper in that. In fact, in *Fogel, supra,* Judge Friendly suggested that it was desirable for disinterested counsel to be "*furnished*" to the independent directors.

**7.** Under the statute:

"(19) 'Interested person' of another person means—

(A) when used with respect to an investment company—

\* \* \* \* \* \*

(iv) any person or partner or employee of any person who at any time since the beginning of the last two fiscal years of such company has acted as legal counsel for such company . . ."

law firm had acted as legal counsel to the Fund during the last two fiscal years. They question whether the minority directors could arrive at a disinterested decision when they were advised by an attorney who was "interested." Second, the plaintiffs contend that it was improper for his firm to counsel parties with divergent interests, namely the Fund and the disinterested quorum.

All attorneys providing legal counsel to mutual funds become, by definition, "interested persons" for some period of time. Under § 10 of the Investment Company Act, 15 U.S.C. § 80a–10, only 60 percent of the members of the board of a registered company may be interested persons. Designating Souther as an interested person, therefore, only serves to limit his participation on the Board *as a director.* It does not mean that the minority directors were interested in the suit, that their deliberations were somehow subject to improper influence or that they lacked the necessary degree of independence.

Plaintiffs nevertheless suggest that in accordance with Judge Frankel's recent decision in *Papilsky v. Berndt,* CCH Fed.Sec.L. Rep. ¶ 95,027 (S.D.N.Y.1976), it was improper for Souther to advise both the Fund and the minority directors. However, in *Papilsky* the law firm advising the fund also served as the investment adviser's counsel, and, as Judge Frankel noted, there was no "suggestion to the Board that, because of the possible conflict of interest, the independent directors should seek disinterested counsel." *Id.* at 90, 133. In the instant action, independent legal advice for the minority directors was not only recommended, it was also obtained. Moreover, there was no conflict of interest on the part of Souther or his law firm: they were retained to represent the Fund in the instant action and it was the disinterested quorum, acting for the Fund, which gave them their instructions as to how to proceed.

■ The plaintiffs also contend that the presence of several defendants during the initial presentations of Judge Fuld and Souther at the first special meeting of the

disinterested quorum demonstrates the minority directors' lack of independence. But the minutes of that meeting and the deposition testimony show that the minority directors invited those defendants to join the meeting so that they could answer questions raised by the minority directors. The minutes of the meeting also indicate that all of the defendants and counsel were excused before the disinterested quorum determined in executive session that it wished to review the pertinent documents and formulate further questions to be answered before reaching any decision.

In this context plaintiffs point to the allegedly misleading nature of statements made to the minority directors by defendant Haire. The minutes of the first special meeting of the disinterested quorum state that Haire "questioned the ability of Anchor to attract and retain the highly qualified personnel they want and need if [the instant action] were being pursued with the acquiescence, if not under the control, of the Fund." The plaintiffs consider this to be in sharp disagreement with Haire's testimony at his disposition that he "never at any time had any doubt that [Anchor] could continue to effectively serve the [F]und if . . . requested to continue or permitted to continue by the board or the shareholders." Apparently to underscore the materiality of Haire's discouraging words to the minority directors, plaintiffs note the contents of an affidavit by the chairman of the disinterested quorum. In that affidavit, the quorum chairman states that in reaching their decision the directors considered that:

"(c) If the action were to proceed against Anchor with the acquiescence or under the control of Fundamental, the adversary relationship that would be created between Fundamental and Anchor and the attendant serious distraction of Anchor's personnel from their efforts on behalf of the shareholders of Fundamental would leave us no practical alternative but to remove Anchor as investment advisor and to seek to retain a new investment adviser; this would necessarily re-

sult in delay, uncertainty and an inevitable lapse in the management of Fundamental's affairs to the serious detriment of its shareholders . . . ."

■ The court is of the opinion that Haire's statements are neither inconsistent nor misleading. His assertions only indicate that he believed it would have been difficult, but not impossible, for Anchor to have continued its service to the Fund faced with this lawsuit. The affidavit of the disinterested quorum chairman shows only the the the minority directors reached a different conclusion: that prosecution of the suit "would necessarily cause the Fund to seek to obtain a different investment adviser immediately." Even if the minority directors erred in this determination, as I have noted in my previous decision, the court cannot upset their reasoned judgment without some showing that the independence of the disinterested quorum was impermissibly curtailed. The plaintiffs have not presented any such evidence.

## V

Finally, the plaintiffs contend that under *Perlman v. Feldman*, 219 F.2d 173, 178 (2d Cir.), *cert. denied*, 349 U.S. 952, 75 S.Ct. 880, 99 L.Ed. 1277 (1955), and *Pepper v. Litton*, 308 U.S. 295, 306, 60 S.Ct. 238, 84 L.Ed. 281 (1939), the defendant directors bear the burden of proving by clear and convincing evidence that they did not breach their fiduciary responsibilities to the corporation and its stockholders. The defendants argue that the plaintiff must shoulder the evidentiary burden because it is the exercise of business judgment by corporate directors which is challenged. *Bellis v. Thal*, 373 F.Supp. 120, 124 (E.D.Pa.1974), *aff'd*, 510 F.2d 969 (3d Cir. 1975); *Marco v. Bank of New York*, 272 F.Supp. 636, 639 (S.D.N.Y. 1967), *aff'd*, 398 F.2d 628 (2d Cir. 1968); *Warshaw v. Calhoun, supra.*

The *Perlman* and *Pepper* cases relied upon by the plaintiffs both involve self-dealing by corporate fiduciaries and are inapplicable here. As I noted in my earlier decision in this matter, the plaintiffs "have not argued that the minority directors have

acted fraudulently or corruptly." 404 F.Supp. at 1180. Moreover, the question before the court is not whether *the defendants* breached their fiduciary obligations to the corporation, but whether suit can proceed against them at all given the decision of the nondefendant minority directors to seek dismissal of this action.

■ It is therefore incumbent upon the plaintiffs to establish that the minority directors actions lacked independence. *Marco v. Bank of New York, supra.* The unsupported contentions of the plaintiffs clearly fail to meet this burden and, accordingly, it is the opinion of this court that the defendants, both corporate and individual, cannot be required to proceed to a trial. I hasten to add, however, that even if the defendants are required as a matter of law to negate any suggestion of unfairness arising from the decision to abandon the derivative claims raised in this suit they have done so. The exhibits presented to the court on both the earlier motion to dismiss and the instant motion show that the minority directors carefully evaluated the opinions tendered by both counsel involved in this action, that they considered the merits of the derivative claims asserted in the complaint, that they discussed the facts and circumstances surrounding the purchase and retention of the notes with several of the defendant directors and that they communicated extensively among themselves before reaching a decision to seek dismissal of this suit.

■ To conclude that the disinterested quorum acted in response to pressure and without justification to immunize Anchor and the defendant directors from possible liability would require this court to presume that bias exists based upon circumstances which seem entirely innocent. For example, as has been noted, the plaintiffs suggest that a finding of improper influence must follow from the fact that the minority directors each knew someone on the Board when they were first selected for nomination or election to the Board. But the existence of casual relationships among

the directors, without more, cannot be taken as an indication that the minority directors were unable to reach an independent business decision. Similarly, because the Investment Company Act terms an attorney whose advice is sought to be an "interested person," plaintiffs seek to suggest that the minority directors had an interest in the contested transaction which went beyond a generalized concern for the security of the Fund.[8] But here again it was obviously reasonable for the minority directors to consult with interested persons, rather than reaching a decision without speaking to either the directors involved in the transaction or counsel.

■ The court of appeals for this circuit has recently cautioned that summary judgment may not be granted unless, drawing all *reasonable* inferences in favor of the nonmovant, no material factual issue is shown. *Heyman v. Commerce and Industry Insurance Co.*, 524 F.2d 1317 (2d Cir. 1975). However, the party opposing the motion must adduce something beyond conclusory allegations. *Donnelly v. Guion*, 467 F.2d 290 (2d Cir. 1972). Here, there has been no showing by the plaintiffs of facts which, if proven, would prohibit the defendants from hiding behind the business judgment cloak. Accordingly, the defendants are granted summary judgment.

SO ORDERED.

---

[8] In a similar effort to brand a minority director as interested, plaintiffs point to the following testimony by director Stephens:

"I remember commenting [at the July 24, 1974 board meeting] on what constituted a disinterested director because in my opinion no director could be disinterested, but I was told that was the proper term.

Later Stephens explained that he didn't like the term "disinterested" since he certainly was not "uninterested."