Miriam J. **WOLF**, Plaintiff-Appellant,

v.

Curtis **BARKES** et al., Defendants-Appellees.

No. 434, Docket 29488.

United States Court of Appeals
Second Circuit.

Argued April 8, 1965.

Decided June 21, 1965.

———◆———

Paul L. Ross, New York City (Wolf, Popper, Ross, Wolf & Jones, Henry H. Wolf, New York City, of counsel), for appellant.

Peter P. Kenny, New York City (Bernard Buchwald, New York City), for appellees Kantor and Blair.

Arnold G. Fraiman, New York City (Dewey, Ballantine, Bushby, Palmer & Wood, Edward N. Sherry, New York City, of counsel), for appellee Curtis Publishing Co.

David R. Hyde, New York City (Cahill, Gordon, Reindel & Ohl, New York City), for appellees Culligan and Mills.

Before WATERMAN, FRIENDLY and ANDERSON, Circuit Judges.

FRIENDLY, Circuit Judge:

Appellant's contention is that the pendency in a federal court of a stockholder's derivative action challenging arrangements between a corporation and its officers deprives the corporation and officers of power to make any out-of-court settlement—that is, one not requiring action by the court in the derivative suit—and that once the suit has been brought, there must be notice to stockholders and court approval as provided in F.R.Civ.P. 23(c), even though the settlement itself calls for no judicial action. Although the contention is interesting and by no means without

force, we think the rule does not go that far.

In May, 1964, plaintiff Miriam J. Wolf, a stockholder of Curtis Publishing Company, brought an action in the District Court for the Southern District of New York against the Company and various individuals, who were said to have been directors, officers, or both, at relevant dates. In support of federal jurisdiction the complaint alleged violation of § 14(a) of the Securities Exchange Act, see § 27; and the doctrine of pendent jurisdiction was relied upon to bring further alleged wrongdoing before the district court. The complaint alleged, *inter alia,* that in 1962 Curtis had employed defendants Culligan and Clifford, Culligan being elected President and Clifford Executive Vice President; that their employment agreements contained common stock options which (save for 15,500 shares in Culligan's case) were contingent upon approval of an increase in Curtis' authorized common stock; that the proxy statement for the 1963 annual meeting of stockholders, at which the management sought approval for such an increase primarily to meet the requirements of these contracts and of a general Restricted Stock Option Incentive Plan, was false and misleading in various respects; that the proposal to increase the authorized common stock did not receive a two-thirds vote of the prior preferred stock although this was required; that ratification of the Restricted Stock Option Incentive Plan was unlawfully obtained because of the lack of separate approval of the additional common stock by the prior preferred; that the grant of stock options to Culligan and Clifford and to the defendant Kantor was wrongful in other respects; that an increase in Culligan's salary agreed to in 1963 constituted a waste of corporate assets; and that the proxy statement had concealed facts the defendants knew or should have known as to the value of mineral rights in Cana-

dian timberlands owned by a subsidiary of Curtis which would result in an increase in the value of Curtis' stock unrelated to any efforts of Culligan, Clifford or other recipients of stock options. Demand upon the directors to sue was alleged to be futile because of their participation in the transactions complained of and their consequent liability; demand upon the stockholders was claimed to be unnecessary and futile. The complaint prayed that the actions taken at the 1963 annual meeting be annulled; that Culligan's, Clifford's and Kantor's stock options be cancelled; that the Restricted Stock Option Incentive Plan and all options thereunder be rescinded; that holders of options surrender any stock obtained by the exercise of options and account for any profits; and that the directors be held liable for any damage suffered by Curtis as a result of the acts alleged.

Various extensions of the time to answer were obtained. The stipulation covering the period from November 3 to November 16, 1964, was given after Curtis promised plaintiff's attorneys not to enter into any agreements with executives or employees settling claims under any of the employment agreements referred to in the complaint. When Curtis and other defendants refused to renew this undertaking and a newspaper article indicated that Curtis was about to make settlements with four defendant-employees who had resigned,[1] plaintiff moved for an order enjoining any compromise or settlement of claims in favor of Curtis asserted in the complaint save with the approval of the district court on notice to all stockholders, as provided in F.R.Civ.P. 23(c). Judge Palmieri denied the motion without opinion, and plaintiff appeals, 28 U.S.C. § 1292(a) (1).

Rule 23(c) provides that "[a] class action shall not be dismissed or compromised without the approval of the court," and also requires that when such an action seeks to enforce a right defined

---

1. Two of these, Kantor and Blair, had brought an action for breach of contract against Curtis in the New York Supreme Court.

in rule 23(a) (1), as the instant one did, "notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs." There can be little doubt that if we look only at the letter of the rule, it does not apply. No one has sought to dismiss or compromise the class suit. Cf. Webster Eisenlohr, Inc. v. Kalodner, 145 F.2d 316, 320 (3 Cir. 1944), cert. denied, 325 U.S. 867, 65 S.Ct. 1404, 89 L.Ed. 1986 (1945). If we go behind the letter to the prime "mischief and defect" the rule was intended to prevent, to wit, "private settlements under which the plaintiff stockholder and his attorney got the sum paid in settlement, and the corporation got nothing," Craftsman Finance & Mortgage Co. v. Brown, 64 F. Supp. 168, 178 (S.D.N.Y.1945),[2] the instant case likewise is not within it. But plaintiff insists it to be anomalous that although she could not compromise the suit without complying with rule 23(c), the corporation should have what she considers to be a greater liberty, and contends that various decisions point in her favor.

The plaintiff argues that a settlement by the corporation with the officers will give them a presumptively valid defense to the claims now being pressed in the derivative suit; and that if the settlement includes a general release, see fn. 5, this may extinguish the corporation's claims against the defendants, not only as recipients of corporate property but also as directors, as neatly as if a derivative plaintiff had dismissed his own suit secretly or after the statute of limitations had run, or if an unfavorable consent judgment had been rendered— schemes against which rule 23(c) was clearly directed. But the situations differ in many important respects.

In the hypothesized cases, the court's own process is being used to obtain a determination which, in one way or another, will bind or prejudice the class on whose behalf the suit was brought. To guard against this is an obviously proper subject for rule-making. There would be ground for doubt whether the authority conferred on the Supreme Court by 28 U.S.C. § 2072 would support a rule invalidating an out-of-court settlement by a corporation simply because it was a defendant in a federal court derivative action. The "great vigilance" exercised by the Supreme Court and its Advisory Committee "in observing the prohibition in the rule-making statute against abridging, enlarging, or modifying the substantive rights of any litigant," 3 Moore, Federal Practice ¶ 1.04[1], at 26 (2d ed. 1964), argues against construing rule 23(c) in a manner that would raise question on this score, when neither the language nor the evident purpose compels.

■ From a practical standpoint also there are important differences between the hypothesized cases and that here before us. While a board of directors dominated by the defendants with whom settlements are made would find it hard to provide a release that would survive charges of self-dealing, dismissal or compromise by an independent stockholder, with the corporation simply standing idle, would not be subject to such easy attack. A new derivative suit against management for fraud or waste in releasing corporate claims for inadequate payment can redress improper settlements even without setting them aside; finding a management target when the derivative shareholder has terminated the corporate claim may be a harder assignment. When the acquiescence of a derivative plaintiff to a dismissal or a consent judgment has in effect been purchased by the defendants, the supposed vigorous champion of the shareholders at large has been retired; far from policing the disposition of the corporate

---

2. That this was the objective is indicated by the Advisory Committee's citation of McLaughlin, Capacity of a Plaintiff-Stockholder to Terminate a Stockholder's Suit, 46 Yale L.J. 421, 430 (1936). See also Note, Control over Settlement of Shareholder's Suit, 54 Harv.L.Rev. 833 (1941); 2 Hornstein, Corporation Law and Practice § 727 (1959).

claim, he may well assist in seeing that the news does not leak out to stir other shareholders to inquiry. No such silencing of the derivative plaintiff occurs when the corporation settles out of court with some of the defendants. Indeed, he is the very person most likely to challenge the settlement, either by pursuing the original action and attempting to overthrow the settlement or by bringing a new action against the directors in which the settlement itself is the gravamen of the complaint.

█ No one would contend that a corporation could not negotiate a release of corporate claims, even against insiders, before a derivative suit was started. The corporation's interest in achieving a favorable settlement does not cease because derivative litigation has begun; especially is this so when some of the defendants in the derivative suit have taken the initiative—as in the present case—in bringing their own actions against the corporation and settlement with them may be impossible unless it can be promptly consummated.

█ It is true that the commencement of a derivative suit provides a handle for judicial supervision not present when the corporation negotiates at an earlier stage, and that permitting out-of-court settlements may be discouraging to attorneys for derivative plaintiffs.[3] It is also true that some suspicion may attach to a settlement made by a board of directors that has shown no inclination to collect corporate claims until its hand is forced by the start of a derivative suit. But though the plaintiff's argument is not one to be lightly overruled, we conclude that the corporation's power to make its own out-of-court settlements, subject to normal shareholder redress, is not abolished by a procedural rule that does not embrace these either in its language or in its primary rationale. Whether it would not be well to expand the principle of rule 23(c) to cover a case like that here presented, and how that can be lawfully done, are not here before us.[4]

The authorities cited by plaintiff do not have the reach she attributes to them. This court's decision in Certain-Teed Prods. Corp. v. Topping, 171 F.2d 241 (2 Cir. 1948), was simply that a sum paid to the attorney for a stockholder plaintiff in a derivative suit in a district court, without the court's knowledge, in consideration for his consenting to the grant of a defendant's motion for summary judgment, could be recouped to the extent it exceeded a reasonable attorney's fee. In Denicke v. Anglo California Nat'l Bank, 141 F.2d 285 (9 Cir.), cert. denied, 323 U.S. 739, 65 S.Ct. 44, 89 L.Ed. 592 (1944), the corporation, which had come under new management, sought and obtained approval of a compromise under rule 23(c); so far as the case has any pertinence, this is only for its implicit holding that when a derivative suit is compromised in a district court, rule 23 (c) must be complied with although the settlement has been instigated not by the derivative plaintiff but by the corporation acting under an independent board of directors. The same implicit holding appears in Birnbaum v. Birrell, 17 F.R.D. 409 (S.D.N.Y. 1955). Of course, the corporation and a defendant have much to

---

3. Whether a derivative plaintiff's attorney might not be entitled to some compensation if he could show that the suit was in some degree responsible for the settlement is another matter. Compare Gilson v. Chock Full O'Nuts Corp., 331 F.2d 107 (2 Cir. 1964). Any out-of-court payment by the corporation to such an attorney would be subject to the principle laid down in Certain-Teed Prods. Corp. v. Topping, 171 F.2d 241, 243–244 (2 Cir. 1948).

4. The SEC urged Congress to provide in the Investment Company Act of 1940 that such companies be forced to seek court approval before settling claims against "insiders" that could be the target of derivative suit; the provision was not enacted. See Note, supra note 2, 54 Harv.L.Rev. at 835–36. Compare Alleghany Corp. v. Kirby, 333 F.2d 327, 347 (2 Cir. 1964) (dissenting opinion), cert. granted, Holt v. Alleghany Corp., 381 U.S. 933, 85 S.Ct. 1772, 14 L. Ed.2d 698 (1965)

gain by having their settlement approved by the court under rule 23(c). After a judicial finding that the settlement is just, following full disclosure and opportunity for stockholders to contest, it will not be easy later to attack the settlement and show that its signers abandoned corporate claims through neglect or self-dealing. But the cases permitting the corporation to comply with the rule and settle in the framework of the derivative action do not make unavailable the out-of-court route, with all its hazards, if the corporation elects to pursue this.

■ What we have written should not be taken as saying that there can never be circumstances under which a federal court, seized of a stockholder's suit, could properly enjoin the corporation, temporarily or finally, from entering into a settlement of a claim for improper dealings with it. We cite, simply by way of illustrating what we have in mind, a case where the beneficiaries of the alleged improper dealing still dominated the board of directors and plaintiffs were able to make some proof that wrongdoing was afoot. But any such action would be taken under the general equity powers of the court—as to which we find ourselves in a considerable measure of agreement with the dissenting opinion of Judge Biggs in Webster Eisenlohr, supra, 145 F.2d at 322–324—and on the facts of the particular case, not in response to a supposed universal command of rule 23(c). The papers here presented to the district judge not merely did not compel but would hardly have justified the taking of such action.[5]

Affirmed.

WATERMAN, Circuit Judge (concurring):

Reluctantly persuaded by the convincing language of my brother FRIENDLY, I concur in the result my colleagues here reach. I am of the belief that it would have been better judicial administration for the learned judge below to have granted a preliminary injunction restraining the corporation from settling, compromising, or issuing releases. Thereby there would have been preserved for all the parties the situation plaintiff was complaining of until final resolution of plaintiff's claims on their merits. Nevertheless, I am persuaded that the unwillingness of the district court to employ the resources available to it within well recognized equity jurisdiction principles is not unreasonable in view of the likelihood that any releases the corporation may have issued will be suspect, the beneficiaries of the compromises made with the corporation will probably remain solvent and will themselves, in the event plaintiff finally substantiates her case, be subject to account to the corporation in whose interest plaintiff has commenced her action.

Moreover, I agree that the language of Rule 23(c), the Rule upon which plaintiff bottomed her motion, does not specifically direct that the trial judge grant the preserving injunction plaintiff requested.

5. We gather from the extracts from the 1965 proxy statement quoted in appellant's reply brief that "settlements" have been made with three former directors, Culligan, Blair and Kantor. Blair and Kantor had left the Company's employ on October 30, 1964, and all options held by them have been ended without being exercised. Culligan's employment contract has been terminated as of Jan. 16, 1966, although valuable rights under the contract continue thereafter. The only moneys moving from the Company, other than compensation continuing to be paid Culligan under his contract, were $75,000 to Kantor and $78,600 to Blair, who had asserted claims approximating $550,000. It does not appear from the proxy statement, or from any other material before us, whether any general releases were executed.