## BURKS ET AL. *v.* LASKER ET AL.

No. 77–1724.   Argued January 17, 1979—Decided May 14, 1979

BRENNAN, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, MARSHALL, BLACKMUN, and STEVENS, JJ., joined. BLACK-MUN, J., filed a concurring opinion, *post,* p. 486. STEWART, J., filed an opinion concurring in the judgment, in which POWELL, J., joined, *post,* p. 487. REHNQUIST, J., took no part in the consideration or decision of the case.

*Daniel A. Pollack* argued the cause for petitioners. With him on the briefs were *Martin I. Kaminsky, Leonard Joseph, John M. Friedman, Jr., Eugene P. Souther,* and *Anthony R. Mansfield.*

*Joseph H. Einstein* argued the cause for respondents. With him on the brief were *Steven Mallis, Leonard Holland,* and *David J. Sweet.*

*Ralph C. Ferrara* argued the cause for the Securities and Exchange Commission as *amicus curiae* urging reversal. With him on the brief were *Solicitor General McCree, Stephen M. Shapiro,* and *Jacob H. Stillman.*\*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

The question presented in this case is whether the disinterested directors of an investment company may terminate a stockholders' derivative suit brought against other directors under the Investment Company and Investment Advisers Acts of 1940, 15 U. S. C. § 80a–1 *et seq.;* 15 U. S. C. § 80b–1 *et seq.* To decide that question, we must determine the appropriate roles of federal and state law in such a controversy.

Respondents, shareholders of Fundamental Investors, Inc., an investment company registered under the Investment Company Act, brought this derivative suit in February 1973 in the District Court for the Southern District of New York. The action was brought against several members of the company's board of directors and its registered investment adviser, Anchor Corp. The complaint alleged that the defendants had violated their duties under the Investment Company Act (ICA),[1] the Investment Advisers Act (IAA),[2] and the common law in connection with the 1969 purchase by the corporation of $20 million in Penn Central Transportation Co. commercial

---

\*Briefs of *amici curiae* urging reversal were filed by *G. Duane Vieth, Paul S. Ryerson,* and *Meyer Eisenberg* for the Investment Company Institute, and by *John E. Tobin, Roger W. Kapp,* and *Richard H. Sayler* for Investors Diversified Services, Inc.

[1] § 13 (a) (3), 54 Stat. 811, as amended, 15 U. S. C. § 80a–13 (a) (3), and former § 36, 54 Stat. 841, 15 U. S. C. § 80a–35 (1964 ed.).

[2] § 206, 54 Stat. 852, as amended, 15 U. S. C. § 80b–6.

paper.[3]  In response to the suit, Fundamental's board of directors determined that the five of its members who were neither affiliated with the investment adviser [4] nor defendants in the action would decide what position the company should take in the case.  On the basis of outside counsel's recommendation and their own investigation, the five, acting as a quorum pursuant to the company's bylaws, concluded that continuation of the litigation was contrary to the best interests of the company and its shareholders and moved the District Court to dismiss the action.

The District Court held that under the so-called "business judgment rule," a quorum of truly disinterested and independent directors has authority to terminate a derivative suit which they in good faith conclude is contrary to the com-

---

[3] The complaint alleged, *inter alia*, that "Anchor breached its statutory, contractual and common law fiduciary duties by relying exclusively upon the representations of *Goldman, Sachs & Co.* (a seller of commercial paper), rather than independently investigating the quality and safety of the Penn Central 270-day notes purchased by the Fund.  It is further alleged that the defendant directors knew or should have known of Anchor's failure to meet its responsibility; that they violated their . . . duties as corporate fiduciaries by acquiescing in Anchor's omissions; that the financial condition of the Penn Central steadily worsened during the period from November 28, 1969 to June 21, 1970, the date that it filed for reorganization; and that during this period of decline all of the defendants failed to investigate and review the financial condition of the Penn Central and the quality and safety of its commercial paper."  426 F. Supp. 844, 847 (1977).

[4] The five were "disinterested" within the meaning of the ICA (see 567 F. 2d 1208, 1209 (CA2 1978)) which provides:

"No registered investment company shall have a board of directors more than 60 per centum of the members of which are persons who are interested persons of such registered company."  15 U. S. C. § 80a–10 (a).

The definition of "interested person" is found at 15 U. S. C. § 80a–2 (a) (19).  See n. 12, *infra*.

Of the remaining six directors, five were defendants in the *Lasker* suit, and one was a director of the investment adviser.  404 F. Supp. 1172, 1175 (1975).

pany's best interests. 404 F. Supp. 1172 (1975). After permitting discovery on the question of the directors' independence, the District Court entered summary judgment against respondents, finding no evidence that the directors who voted to terminate the suit had acted other than independently and in good faith. 426 F. Supp. 844 (1977). The Court of Appeals for the Second Circuit reversed, 567 F. 2d 1208, 1212 (1978), holding that as a consequence of the ICA, "disinterested directors of an investment company do not have the power to foreclose the continuation of nonfrivolous litigation brought by shareholders against majority directors for breach of their fiduciary duties." We granted certiorari, 439 U. S. 816 (1978). We reverse.

I

A fundamental issue in this case is which law—state or federal—governs the power of the corporation's disinterested directors to terminate this derivative suit. The first step in making that determination is to ascertain which law creates the cause of action alleged by the plaintiffs. Neither the ICA nor the IAA—the plaintiff's two federal claims—expressly creates a private cause of action for violation of the sections relevant here. However, on the basis of District and Circuit precedent, the courts below assumed that an implied private right of action existed under each Act. *Brown* v. *Bullock,* 194 F. Supp. 207, 222–228 (SDNY), aff'd, 294 F. 2d 415 (CA2 1961) (en banc) (ICA); *Abrahamson* v. *Fleschner,* 568 F. 2d 862 (CA2 1977) (IAA); *Bolger* v. *Laventhol, Krekstein, Horwath & Horwath,* 381 F. Supp. 260 (SDNY 1974) (IAA). The two courts also sanctioned the bringing of the suit in derivative form, apparently assuming that, as we held in *J. I. Case Co.* v. *Borak,* 377 U. S. 426, 432 (1964), "[t]o hold that derivative actions are not within the sweep of the [right] would . . . be tantamount to a denial of private relief." As petitioners never disputed the existence of private, derivative causes of action under the Acts, and as in this Court all agree

that the question has not been put in issue, Brief for Petitioners 28; Brief for Respondents 15, we shall assume without deciding that respondents have implied, derivative causes of action under the ICA and IAA.[5]

Since we proceed on the premise of the existence of a federal cause of action, it is clear that "our decision is not controlled by *Erie R. Co.* v. *Tompkins,* 304 U. S. 64," and state law does not operate of its own force. *Sola Electric Co.* v. *Jefferson Co.,* 317 U. S. 173, 176 (1942). See *Board of Comm'rs* v. *United States,* 308 U. S. 343, 349–350 (1939); *Deitrick* v. *Greaney,* 309 U. S. 190, 200 (1940); C. Wright, Federal Courts 284 (3d ed. 1976); Mishkin, The Variousness of "Federal Law": Competence and Discretion in the Choice of National and State Rules for Decision, 105 U. Pa. L. Rev. 797, 799–800 (1957); Hart, The Relations Between State and Federal Law, 54 Colum. L. Rev. 489, 529 (1954); 2 L. Loss, Securities Regulation 971 (2d ed. 1961). Rather, "[w]hen a federal statute condemns an act as unlawful, the extent and nature of the legal consequences of the condemnation, though left by the statute to judicial determination, are nevertheless federal questions, the answers to which are to be derived from the statute and the federal policy which it has adopted." *Sola*

---

[5] The question whether a cause of action exists is not a question of jurisdiction, and therefore may be assumed without being decided. Cf. *Mt. Healthy City Board of Ed.* v. *Doyle,* 429 U. S. 274, 279 (1977); *Bell* v. *Hood,* 327 U. S. 678, 682 (1946). Other Courts of Appeals have agreed with the Second Circuit that the ICA and IAA create private causes of action. As to the ICA, see *Moses* v. *Burgin,* 445 F. 2d 369, 373 (CA1 1971); *Esplin* v. *Hirschi,* 402 F. 2d 94, 103 (CA10 1968). See also *Herpich* v. *Wallace,* 430 F. 2d 792, 815 (CA5 1970); *Taussig* v. *Wellington Fund, Inc.,* 313 F. 2d 472, 476 (CA3 1963). Compare *Greater Iowa Corp.* v. *McLendon,* 378 F. 2d 783, 793 (CA8 1967), with *Brouk* v. *Managed Funds, Inc.,* 286 F. 2d 901 (CA8 1961), vacated as moot, 369 U. S. 424 (1962). As to the IAA, see *Lewis* v. *Transamerica Corp.,* 575 F. 2d 237 (CA9), cert. granted *sub nom. Transamerica Mortgage Advisors, Inc.* v. *Lewis,* 439 U. S. 952 (1978); *Wilson* v. *First Houston Investment Corp.,* 566 F. 2d 1235 (CA5 1978).

*Electric Co.* v. *Jefferson Co., supra,* at 176. See *Tunstall* v. *Locomotive Firemen & Enginemen,* 323 U. S. 210, 213 (1944); *Board of Comm'rs* v. *United States, supra.* Cf. *United States* v. *Kimbell Foods, Inc.,* 440 U. S. 715, 726–727 (1979); *Butner* v. *United States,* 440 U. S. 48 (1979). Legal rules which impact significantly upon the effectuation of federal rights must, therefore, be treated as raising federal questions. See *Robertson* v. *Wegmann,* 436 U. S. 584, 588 (1978) (statute of limitations); *Auto Workers* v. *Hoosier Corp.,* 383 U. S. 696, 701 (1966) (same); *J. I. Case Co.* v. *Borak, supra,* at 435 (security for expenses statute); *Sola Electric Co.* v. *Jefferson Co., supra,* at 176 (rules of estoppel); *Deitrick* v. *Greaney, supra,* at 200 (affirmative defense to federal· claim). See generally Friendly, In Praise of *Erie*—and of the New Federal Common Law, 39 N. Y. U. L. Rev. 383, 408 (1964); Hill, State Procedural Law in Federal Nondiversity Litigation, 69 Harv. L. Rev. 66, 92–93 (1955). Thus, "the overriding federal law applicable here would, *where the facts required,* control the appropriateness of redress despite the provisions of state corporation law . . . ." *J. I. Case Co.* v. *Borak, supra,* at 434 (emphasis added).

## II

The fact that "the scope of [respondents'] federal right is, of course, a federal question" does not, however, make state law irrelevant. *De Sylva* v. *Ballentine,* 351 U. S. 570, 580 (1956). Cf. *United States* v. *Kimbell Foods, Inc., supra,* at 727–728. It is true that in certain areas we have held that federal statutes authorize the federal courts to fashion a complete body of federal law. See *Textile Workers* v. *Lincoln Mills,* 353 U. S. 448, 451, 456–457 (1957). Corporation law, however, is not such an area.

A derivative suit is brought by shareholders to enforce a claim on behalf of the corporation. See Note, The Demand and Standing Requirements in Stockholder Derivative Actions, 44 U. Chi. L. Rev. 168 (1976). This case involves the ques-

tion whether directors are authorized to determine that certain claims not be pursued on the corporation's behalf. As we have said in the past, the first place one must look to determine the powers of corporate directors is in the relevant State's corporation law. See *Santa Fe Industries, Inc.* v. *Green,* 430 U. S. 462, 479 (1977); *Cort* v. *Ash,* 422 U. S. 66, 84 (1975). "Corporations are creatures of state law," *ibid.,* and it is state law which is the font of corporate directors' powers. By contrast, federal law in this area is largely regulatory and prohibitory in nature—it often limits the exercise of directorial power, but only rarely creates it. Cf. *Price* v. *Gurney,* 324 U. S. 100, 107 (1945). In short, in this field congressional legislation is generally enacted against the background of existing state law; Congress has never indicated that the entire corpus of state corporation law is to be replaced simply because a plaintiff's cause of action is based upon a federal statute. *Cort* v. *Ash, supra; Santa Fe Industries, Inc.* v. *Green, supra.* See *United Copper Securities Co.* v. *Amalgamated Copper Co.,* 244 U. S. 261, 264 (1917). Cf. *United States* v. *Yazell,* 382 U. S. 341, 352–353 (1966) (state family law); *De Sylva* v. *Ballentine, supra,* at 580 (same); P. Bator, P. Mishkin, D. Shapiro, & H. Wechsler, The Federal Courts and The Federal System 470–471 (1973 ed.).

Federal regulation of investment companies and advisers is not fundamentally different in this respect. Mutual funds, like other corporations, are incorporated pursuant to state, not federal, law. Although the Court of Appeals found it significant that "nothing in . . . the legislation regulating investment companies and their advisers . . . suggests that . . . disinterested directors . . . have the power to terminate litigation brought by mutual fund stockholders . . . ," 567 F. 2d, at 1210, such silence was to be expected. The ICA does not purport to be the source of authority for managerial power; rather, the Act functions primarily to "impos[e] *controls and restrictions* on the internal management of investment companies." *United*

*States* v. *National Assn. of Securities Dealers,* 422 U. S. 694, 705 n. 13 (1975) (emphasis added).

The ICA and IAA, therefore, do not require that federal law displace state laws governing the powers of directors unless the state laws permit action prohibited by the Acts, or unless "their application would be inconsistent with the federal policy underlying the cause of action . . . ." *Johnson* v. *Railway Express Agency,* 421 U. S. 454, 465 (1975).[6] Cf. *Robertson* v. *Wegmann, supra,* at 590; *Auto Workers* v. *Hoosier Corp., supra,* at 706–707; *Sola Electric Co.* v. *Jefferson Co.,* 317 U. S., at 176. Although "[a] state statute cannot be considered 'inconsistent' with federal law merely because the statute causes the plaintiff to lose the litigation," *Robertson* v. *Wegmann, supra,* at 593, federal courts must be ever vigilant to insure that application of state law poses "no significant threat to any identifiable federal policy or interest . . . ." *Wallis* v. *Pan American Petroleum Corp.,* 384 U. S. 63, 68 (1966). See *Auto Workers* v. *Hoosier Corp., supra,* at 702. Cf. *Brown* v. *Western R. Co. of Alabama,* 338 U. S. 294, 298 (1949). And, of course, this means that "unreasonable," *Wallis* v. *Pan American Petroleum Corp., supra,* at 70, or "specific aberrant or hostile state rules," *United States* v. *Little Lake Misere Land Co.,* 412 U. S. 580, 596 (1973), will not

---

[6] This is not a situation where federal policy requires uniformity and, therefore, where the very application of varying state laws would itself be inconsistent with federal interests. In enacting the ICA and IAA, Congress did declare that "the activities of such companies, extending over many States, . . . make difficult, if not impossible, effective State regulation of such companies . . . ." 15 U. S. C. § 80a–1 (a)(5). But as long as private causes of action are available in federal courts for violation of the federal statutes, this enforcement problem is obviated. The real concern, therefore, is not that state laws be uniform, but rather that the laws applied in suits brought to enforce federal rights meet the standards necessary to insure that the "prohibition of [the] federal statute . . . not be set at naught," *Sola Electric Co.* v. *Jefferson Co.,* 317 U. S. 173, 176 (1942). The "consistency" requirement described in text guarantees that state laws failing to meet these standards will be precluded.

be applied. See, *e. g., Levitt* v. *Johnson,* 334 F. 2d 815, 819–820 (CA1 1964). The "consistency" test guarantees that "[n]othing that the state can do will be allowed to destroy the federal right," *Board of Comm'rs* v. *United States,* 308 U. S., at 350, and yet relieves federal courts of the necessity to fashion an entire body of federal corporate law out of whole cloth.

### III

The foregoing indicates that the threshold inquiry for a federal court in this case should have been to determine whether state law permitted Fundamental's disinterested directors to terminate respondents' suit. If so, the next inquiry should have been whether such a state rule was consistent with the policy of the ICA and IAA. Neither the District Court nor the Court of Appeals decided the first question, apparently because neither considered state law particularly significant in determining the authority of the independent directors to terminate the action.[7] And in that circumstance, neither court addressed the question of inconsistency between state and federal law. At least implicitly, however, the Court of Appeals did make a related determination. Its holding that nonfrivolous derivative suits may never be terminated makes manifest its view that no other rule—whether state or federal—would be consistent with the ICA.[8] We disagree.

The Court of Appeals correctly noted, 567 F. 2d, at 1210–1211, that Congress was concerned about the potential for abuse inherent in the structure of investment companies. A mutual fund is a pool of assets, consisting primarily of portfolio securities, and belonging to the individual investors holding shares in the fund. *Tannenbaum* v. *Zeller,* 552 F. 2d 402, 405 (CA2 1977). Congress was concerned because

"[m]utual funds, with rare exception, are not operated

---

[7] See 567 F. 2d 1208 (CA2 1978); 404 F. Supp. 1172 (SDNY 1975).

[8] The Court of Appeals did not undertake any separate analysis of the policy behind the ICA's companion statute, the IAA.

by their own employees. Most funds are formed, sold, and managed by external organizations, [called 'investment advisers,'] that are separately owned and operated. . . . The advisers select the funds' investments and operate their businesses. . . .

"Since a typical fund is organized by its investment adviser which provides it with almost all management services . . . , a mutual fund cannot, as a practical matter sever its relationship with the adviser. Therefore, the forces of arm's-length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy." S. Rep. No. 91–184, p. 5 (1969).

As a consequence, "[t]he relationship between investment advisers and mutual funds is fraught with potential conflicts of interest," *Galfand* v. *Chestnutt Corp.*, 545 F. 2d 807, 808 (CA2 1976). See generally S. Rep. No. 91–184, *supra*, at 5; H. R. Rep. No. 2337, 89th Cong., 2d Sess., 9, 45–46, 64 (1966); H. R. Doc. No. 136, 77th Cong., 1st Sess., 2485–2490, 2569, 2579–2580, 2775 (1942); Hearings before a Subcommittee of the House Committee on Interstate and Foreign Commerce on H. R. 10065, 76th Cong., 3d Sess., 58–59 (1940); Securities and Exchange Commission, Report on Investment Trusts and Investment Companies, pt. 3, pp. 1–49 (1940); 15 U. S. C. § 80a–1 (b) (findings and declaration of policy).[9] Yet, while these potential conflicts may justify some restraints upon the unfettered discretion of even disinterested mutual fund directors, particularly in their transactions with the investment adviser,[10] they hardly justify a flat rule that directors may

---

[9] See also *Tannenbaum* v. *Zeller*, 552 F. 2d 402, 405 (CA2 1977); Radmer, Duties of the Directors of Investment Companies, 3 J. Corp. L. 61, 63 (1977); Note, 47 Ford. L. Rev. 568 (1979).

[10] See, *e. g.*, § 36 of the ICA, 54 Stat. 841, as amended, 15 U. S. C. § 80a–35, and § 206 of the IAA, 54 Stat. 852, as amended, 15 U. S. C. § 80b–6, imposing minimum standards on the behavior of investment company directors and advisers which presumably apply as much to their

never terminate nonfrivolous derivative actions involving co-directors. In fact, the evidence is overwhelming that Congress did not intend to require any such absolute rule.

The cornerstone of the ICA's effort to control conflicts of interest within mutual funds is the requirement that at least 40% of a fund's board be composed of independent outside directors.[11] 15 U. S. C. § 80a–10 (a). As originally enacted, § 10 of the Act required that these 40% not be officers or employees of the company or "affiliated persons" of its adviser. 54 Stat. 806. In 1970, Congress amended the Act to strengthen further the independence of these directors, adding the stricter requirement that the outside directors not be "interested persons." See 15 U. S. C. §§ 80a–10 (a), 80a–2 (a)(19).[12] To these statutorily disinterested directors, the

---

decisions regarding litigation as to the other decisions they may be called upon to make. See *Santa Fe Industries, Inc.* v. *Green*, 430 U. S. 462, 471 n. 11 (1977) ("Congress intended the Investment Advisers Act to establish federal fiduciary standards for investment advisers"); *SEC* v. *Capital Gains Research Bureau*, 375 U. S. 180, 191–192 (1963); *Cramer* v. *General Tel. & Electronics Corp.*, 582 F. 2d 259, 275 (CA3 1978); *Tannenbaum* v. *Zeller, supra*, at 418–419.

[11] Under certain circumstances, independent directors must constitute a majority rather than 40% of the board. See 15 U. S. C. § 80a–10 (b).

[12] Title 15 U. S. C. § 80a–2 (a)(19) defines an " 'interested person' of another person . . . when used with respect to an investment company," as

"(i) any affiliated person of such company,

"(ii) any member of the immediate family of any natural person who is an affiliated person of such company,

"(iii) any interested person of any investment adviser of or principal underwriter for such company,

"(iv) any person or partner or employee of any person who at any time since the beginning of the last two fiscal years of such company has acted as legal counsel for such company,

"(v) any broker or dealer registered under the Securities Exchange Act of 1934 or any affiliated person of such a broker or dealer, and

"(vi) any natural person whom the Commission by order shall have determined to be an interested person by reason of having had, at any time since the beginning of the last two fiscal years of such company, a material business or professional relationship with such company or with

Act assigns a host of special responsibilities involving supervision of management and financial auditing. They have the duty to review and approve the contracts of the investment adviser and the principal underwriter, 15 U. S. C. § 80a–15 (c); the responsibility to appoint other disinterested directors to fill vacancies resulting from the assignment of the advisory contracts, 15 U. S. C. § 80a–16 (b); and are required to select the accountants who prepare the company's Securities and Exchange Commission financial filings, 15 U. S. C. § 80a–31 (a).

Attention must be paid as well to what Congress did *not* do. Congress consciously chose to address the conflict-of-interest problem through the Act's independent-directors section, rather than through more drastic remedies such as complete disaffiliation of the companies from their advisers or compulsory internalization of the management function. See Report of the SEC on the Public Policy Implications of Investment Company Growth, H. R. Rep. No. 2337, 89th Cong., 2d Sess., 147–148 (1966). Congress also decided *not* to incorporate into the 1940 Act a provision, proposed by the

---

the principal executive officer of such company or with any other investment company having the same investment adviser or principal underwriter or with the principal executive officer of such other investment company."

Title 15 U. S. C. § 80a–2 (a)(2) states that " '[a]ffiliated company' means a company which is an affiliated person," and 15 U. S. C. § 80a–2 (a)(3) defines " 'affiliated person' of another person" as

"(A) any person directly or indirectly owning, controlling, or holding with power to vote, 5 per centum or more of the outstanding voting securities of such other person; (B) any person 5 per centum or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by such other person; (C) any person directly or indirectly controlling, controlled by, or under common control with, such other person; (D) any officer, director, partner, copartner, or employee of such other person; (E) if such other person is an investment company, any investment adviser thereof or any member of an advisory board thereof; and (F) if such other person is an unincorporated investment company not having a board of directors, the depositor thereof."

SEC, that would have forced investment companies to seek court approval before settling claims against "insiders" that could be the target of derivative suits. See S. 3580, 76th Cong., 3d Sess., § 33 (a) (1940); *Wolf* v. *Barkes*, 348 F. 2d 994, 997 n. 4 (CA2 1965). And when Congress did intend to prevent board action from cutting off derivative suits, it said so expressly. Section 36 (b), 84 Stat. 1428, 15 U. S. C. § 80a–35 (b)(2), added to the Act in 1970, performs precisely this function for derivative suits charging breach of fiduciary duty with respect to adviser's fees.[13] No similar provision exists for derivative suits of the kind involved in this case.

Congress' purpose in structuring the Act as it did is clear. It "was designed to place the unaffiliated directors in the role of 'independent watchdogs,'" *Tannenbaum* v. *Zeller,* 552 F. 2d, at 406, who would "furnish an independent check upon the management" of investment companies, Hearings on H. R. 10065 before a Subcommittee of the House Committee on Interstate and Foreign Commerce, 76th Cong., 3d Sess., 109 (1940). This "watchdog" control was chosen in preference to the more direct controls on behavior exemplified by the options not adopted. Indeed, when by 1970 it appeared that the "affiliated person" provision of the 1940 Act might not be adequately restraining conflicts of interest, Congress turned not to direct controls, but rather to stiffening the requirement of independence as the way to "remedy the act's deficiencies." S. Rep. No. 91–184, pp. 32–33 (1969).[14] Without question, "[t]he function of these provisions with respect to unaffiliated directors [was] to supply an independent check on management and to provide a means for the representation of shareholder interests in investment company affairs." *Id.,* at 32.

In short, the structure and purpose of the ICA indicate that

---

[13] See also § 16 (b) of the Securities Exchange Act of 1934, 15 U. S. C. § 78p (b), which authorizes shareholder suits to recover insider "short swing" profits on behalf of the company notwithstanding the decision of the board of directors not to sue.

[14] See n. 12, *supra.*

Congress entrusted to the independent directors of investment companies, exercising the authority granted to them by state law, the primary responsibility for looking after the interests of the funds' shareholders.[15]   There may well be situations in which the independent directors could reasonably believe that the best interests of the shareholders call for a decision not to sue—as, for example, where the costs of litigation to the corporation outweigh any potential recovery.   See Note, 47 Ford. L. Rev. 568, 580 (1979); Note, 44 U. Chi. L. Rev., at 196. See, *e. g., Tannenbaum* v. *Zeller, supra,* at 418; *Cramer* v. *General Tel. & Electronics Corp.,* 582 F. 2d 259, 275 (CA3 1978). In such cases, it would certainly be consistent with the Act to allow the independent directors to terminate a suit, even though not frivolous.   Indeed, it would have been paradoxical for Congress to have been willing to rely largely upon "watchdogs" to protect shareholder interests and yet, where the "watchdogs" have done precisely that, require that they be totally muzzled.[16]

---

[15] As an adjunct to its main argument which rested upon the structure of the ICA, the Court of Appeals was also of the view that mutual fund directors can never be truly disinterested in suits involving their codirectors.   567 F. 2d, at 1212.   While lack of impartiality may or may not be true as a matter of fact in individual cases, it is not a conclusion of law required by the ICA.   Congress surely would not have entrusted such critical functions as approval of advisory contracts and selection of accountants to the statutorily disinterested directors had it shared the Court of Appeals' view that such directors could never be "disinterested" where their codirectors or investment advisers were concerned.   In fact, although it was speaking only of the statutory definition, Congress declared in the second section of the Act that "no person shall be deemed to be an interested person of an investment company solely by reason of . . . his being a member of its board of directors or advisory board . . . ."   15 U. S. C. § 80a–2 (a)(19).   See also 15 U. S. C. § 80a–2 (a)(9) ("A natural person shall be presumed not to be a controlled person within the meaning of this subchapter").

[16] As an alternative ground in support of the judgment below, respondents urge that Fed. Rule Civ. Proc. 23.1 prohibits termination of this derivative action.   That Rule states that a derivative action "shall not be

## IV

We hold today that federal courts should apply state law governing the authority of independent directors to discontinue derivative suits to the extent such law is consistent with the policies of the ICA and IAA. Moreover, we hold that Congress did not require that States, or federal courts, absolutely forbid director termination of all nonfrivolous actions. However, since "[w]e did not grant certiorari to decide [a question of state law]," *Butner* v. *United States,* 440 U. S. 48, 51 (1979), and since neither the District Court nor the Court of Appeals decided the point,[17] the case is reversed and remanded for further proceedings consistent with this opinion. *Butner* v. *United States; Wallis* v. *Pan American Petroleum Corp.,* 384 U. S., at 72.

*Reversed and remanded.*

MR. JUSTICE REHNQUIST took no part in the consideration or decision of this case.

MR. JUSTICE BLACKMUN, concurring.

I join the Court's opinion and its judgment. In so doing, I read that opinion to hold that on remand the Court of Appeals is free to determine and, indeed, should determine what the state law in this area requires, and then whether that state law is consistent with the policies of the Investment Company

---

dismissed or compromised without the approval of the court . . . ." However, as Judge Friendly noted with respect to former Rule 23 (c), those words apply only to voluntary settlements between derivative plaintiffs and defendants, and were intended to prevent plaintiffs from selling out their fellow shareholders. They do not apply where the plaintiffs' action is involuntarily dismissed by a court, as occurred in this case. *Wolf* v. *Barkes,* 348 F. 2d 994, 996–997 (CA2 1965). The same is true of the identically worded Rule 23.1. See C. Wright & A. Miller, Federal Practice and Procedure § 1839, pp. 427, 435, 436 (1972); 3B J. Moore, Federal Practice ¶ 23.1.24 [2], App. p. 23.1–131 (1978).

[17] In this Court, the parties hotly dispute the content of the correct state rule. Compare Brief for Petitioners 36–38 with Brief for Respondents 35–39.

and Investment Advisers Acts. This reading, of course, is at odds with the absolutist position taken by the opinion concurring in the judgment, but it seems to me that a situation could very well exist where state law conflicts with federal policy. The effectuation of that federal policy should not then be foreclosed, as the concurring opinion implies it would be.

MR. JUSTICE STEWART, with whom MR. JUSTICE POWELL joins, concurring in the judgment.

The Investment Company Act of 1940 and the Investment Advisers Act of 1940 are silent on the question whether the disinterested directors of an investment company may terminate a stockholders' derivative suit. The inquiry thus must turn to the relevant state law. I cannot agree with the implications in the Court's opinion, *ante,* at 480, 481–482, 486, that there is any danger that state law will conflict with federal policy.

The business decisions of a corporation are normally entrusted to its board of directors. A decision whether or not a corporation will sue an alleged wrongdoer is no different from any other corporate decision to be made in the collective discretion of the disinterested directors. *E. g., Swanson* v. *Traer,* 354 U. S. 114, 116; *United Copper Securities Co.* v. *Amalgamated Copper Co.,* 244 U. S. 261, 263; *McKee* v. *Rogers,* 18 Del. Ch. 81, 156 A. 191 (1931); *Rice* v. *Wheeling Dollar Savings & Trust Co.,* 130 N. E. 2d 442 (Ohio Ct. Com. Pleas 1954); *Goodwin* v. *Castleton,* 19 Wash. 2d 748, 144 P. 2d 725 (1944).

On remand, the issue will be whether the state law here applicable recognizes this generally accepted principle and thereby empowers the directors to terminate this stockholder suit. Since Congress intended disinterested directors of mutual funds to be "independent watchdogs," *ante,* at 484, I can see no possible conflict between this generally accepted principle of state law and the federal statutes in issue.