**Frank J. EVANGELIST, Jr.**

v.

**FIDELITY MANAGEMENT & RESEARCH COMPANY and Fidelity Cash Reserves.**

**Civ. A. No. 81–536–Z.**

United States District Court, D. Massachusetts.

Dec. 6, 1982.

Avram G. Hammer, Boston, Mass., Richard M. Meyer, Milberg, Weiss, Bershad & Specthrie, New York City, for plaintiff.

James S. Dittmar, Margaret R. Hinkle, Berman, Dittmar & Engel, Boston, Mass., for defendant Fidelity Management & Research Co.

Peter M. Saparoff, Gaston, Snow & Ely Bartlett, Boston, Mass., for defendant Fidelity Cash Reserves.

### MEMORANDUM OF DECISION

ZOBEL, District Judge.

This is a shareholder derivative suit brought against Fidelity Management & Research Company ("FMR") and Fidelity Cash Reserves (the "Trust"). Plaintiff Frank J. Evangelist, Jr., a shareholder in the Trust, alleges that FMR breached its fiduciary duty under Section 36(b) of the Investment Company Act of 1940 (the "Act"), 15 U.S.C. § 80a–35(b), because management fees paid to it by the Trust are excessive. He further claims that a proxy statement sent to the Trust's shareholders is materially false and misleading in violation of Section 20 of the Act, 15 U.S.C. § 80a–20, and Section 14 of the Securities Exchange Act of 1934, 15 U.S.C. § 78n. FMR and the Trust have moved to dismiss the 36(b) claim pursuant to Fed.R.Civ.P. 12(b)(6) and 23.1. The Trust moves alternatively for summary judgment. Both de-

fendants seek partial summary judgment on the proxy fraud claim. They also seek dismissal of a related action *("Evangelist I")* filed earlier in time but alleging substantially identical 36(b) violations.[1] Without deciding the disposition of the earlier action,[2] I conclude that, as to the later action, the motion to dismiss plaintiff's proxy claim should be allowed. Defendants' motions concerning the 36(b) claim are denied.

The relevant facts are contained in the plaintiff's complaint (which must be taken as true for purposes of the motion to dismiss) and in affidavits submitted in support of the motion for summary judgment. The Trust is a diversified open-end investment company organized in December 1978 as a Massachusetts business trust. It is a "money market" mutual fund registered under the Act with the Securities Exchange Commission. The Trust invests in a portfolio of short-term money market instruments, which include government securities, commercial paper and corporate obligations. FMR is the Trust's investment adviser, its monthly fee geared toward the Trust's gross income. The fee is set by an advisory and service contract negotiated by the Trust's board of trustees, a majority of whom are "disinterested" as defined by the Act. As a result, in part, of a tremendous increase in the Trust's assets, FMR's fees have skyrocketed over the years. According to plaintiff's complaint, the fees were and are disproportionate to the relatively routine, low-cost services FMR renders.

On July 20, 1981, plaintiff mailed a letter to the Trust's board of trustees, enclosing a copy of the complaint in the related case of *Evangelist I*[3] and demanding that the board bring suit against FMR. On September 28 of that year, plaintiff's counsel met with a special committee of disinterested trustees appointed to review plaintiff's demand. On October 13, the chairman of the disinterested trustees informed plaintiff's lawyer that the committee had decided that the Trust should not institute suit against FMR. However, it had tentatively negotiated substantial reductions in FMR's fees which the board was expected to approve. Shortly thereafter, the trustees did approve new fee limitations, to become effective October 26. On April 6, 1982, plaintiff filed *Evangelist II*. The complaint states that despite the negotiated fee reduction, FMR's fees remain excessive, in violation of section 36(b) of the Act. The suit seeks damages from FMR payable to the Trust as well as attorney's fees.

Plaintiff's proxy claim concerns materials sent on February 24, 1982 to the Trust's shareholders, who were to vote on the newly negotiated contract with FMR.[4] Plaintiff alleges that the proxy statement misstates the fee revisions, pointing to disparities between a schedule of fee limitations on page 8 of the statement and a table of effective rates set forth in an affidavit submitted in connection with *Evangelist I*. No demand was made on the board of trustees in connection with the proxy claim, al-

1. Civ.Action No. 81–536–Z (*Evangelist I*) was filed on February 25, 1981 without plaintiff having made a demand on the Trust to institute suit. While plaintiff contended that no demand was required in a 36(b) action, I found on July 20, 1981 that one was indeed necessary if plaintiff was to go forward. Following his demand and the refusal by the trustees of the Trust to sue, plaintiff amended his complaint in *Evangelist I*, then several months later, filed a second suit, Civ.Action No. 82–912–Z (*Evangelist II*). Only the motions in connection with *Evangelist II* are decided here.

2. Plaintiff has stipulated that *Evangelist I* should be dismissed if the Supreme Court denies *certiorari* in the case of *Grossman v. Johnson*, 674 F.2d 115, Fed.Sec.L.Rep. (CCH) ¶ 98,-

619 (1st Cir.1982). The First Circuit held in that case that a pre-complaint demand was required in a derivative suit brought under 36(b) of the Act. The Supreme Court denied *certiorari* on October 4, 1982, but I understand that plaintiff filed a petition for rehearing. No action will be taken until the Court has acted on that.

3. *Evangelist I*, described in footnote 1, *supra*, also attacked FMR's advisory fees. It contained no claim of proxy fraud, however.

4. The shareholders later approved the contract with FMR by a wide margin. The effect of that approval on plaintiff's challenge, however, is not now before the Court.

though plaintiff takes the position that the demand is excused.

### A. *The 36(b) Claim.*

■ Defendants seek dismissal of the 36(b) claim in *Evangelist II* not on the grounds that plaintiff has failed to make a demand[5] but rather that the trustees' response to that demand bars a derivative suit. First, defendants contend that the trustees' refusal to sue must be honored because it was made in good faith. Second, the renegotiation of FMR's fees amount to a satisfaction of plaintiff's demand, so that his failure to show why the fee reductions are unreasonable or made in bad faith deprives him of the ability to press his claim.

The thrust of FMR's argument in support of its motion to dismiss is that plaintiff's pursuit of his claim over trustees' rejection and in spite of the fee renegotiation fails to satisfy the demand requirement of Rule 23.1. The Trust joins in this argument, but alternatively moves for summary judgment on the ground that the trustees' response falls within the business judgment rule. Both the demand requirement of Rule 23.1 and the business judgment rule stem from the principle that primary responsibility for corporate management lies with the board of directors. They are not the same, however, carrying different legal standards, serving different purposes, and having different legal consequences. The distinction between the two is particularly important here, since both rules are invoked.

■ The demand requirement is essentially a requirement that a shareholder exhaust his intracorporate remedies before going to court with a derivative suit. *Galef v. Alexander,* 615 F.2d 51, 59 (2d Cir.1980). Forcing the shareholder to go to directors first reinforces their position as corporate managers by giving them the opportunity to sue on behalf of the corporation or to remedy the problem of which plaintiff complains. Note, "The Demand and Standing Requirements in Shareholder Derivative Actions," 44 U.Chi.L.Rev. 168, 171 (1976). The demand requirement is thus primarily addressed to the question of *who* will pursue the claim—the corporation through its directors or the shareholder in a derivative suit. *See Weiss v. Temporary Investment Fund, Inc.,* 516 F.Supp. 665, 670 n. 13 (D.Del.1981). The First Circuit strictly enforces the demand requirement of 23.1, excusing demand only in exceptional circumstances. *See, e.g., Grossman v. Johnson,* 674 F.2d 115, Fed.Sec.L.Rep. (CCH) ¶ 98,619 (1st Cir.1982); *Untermeyer v. Fidelity Daily Income Trust,* 580 F.2d 22 (1978); *Heit v. Baird,* 567 F.2d 1157 (1977); *In re Kauffman Mutual Fund Actions,* 479 F.2d 257 (1973). But the rationale of those cases is not that the directors are able to preclude suit entirely by refusing a demand. Rather, they rest on the proposition that directors, despite being defendants, are still capable of making an honest decision about whether to sue on the corporation's behalf. *See Galef v. Alexander,* 615 F.2d at 59. Failure to make demand only temporarily bars the shareholder's suit. Whether the directors correctly assessed the merits of the corporate claim in refusing plaintiff's demand relates to plaintiff's standing to sue, not to whether intracorporate remedies have been exhausted. Note, 44 U.Chi.L. Rev. at 181.

■ The business judgment rule, on the other hand, may permanently cut off plaintiff. It determines the extent to which the directors' response to a demand should be binding on the court. The rule originated as a means of limiting liability of

---

5. The Trust makes a passing reference to the alleged insufficiency of the demand, pointing out that the trustees received a copy of *Evangelist I,* which contained allegations concerning only FMR's initial fees, not the revised ones. The trustees were on clear notice that plaintiff intended to attack FMR's fees in general, however, and met with plaintiff's counsel on September 28, 1981 to discuss his demand. The revised fees were approved ten days after the trustees rejected plaintiff's demand October 13. Under these circumstances, no second demand is required. Any effect the fee reductions may have on plaintiff's standing to bring a derivative suit is a question distinct from whether plaintiff has made an adequate demand under 23.1.

corporate officers and directors for mere mistakes or judgment errors so as to give them the latitude they need to run a corporation; courts will not second-guess their decisions if made honestly, in good faith and in pursuit of legitimate corporate purposes. 3A Fletcher, *Cyclopedia of the Law of Private Corporations,* § 1039 (perm. ed. 1975). The rule has been applied to the decision of whether to sue, itself a matter of internal corporate management. *See, e.g., United Copper Securities Co. v. Amalgamated Copper Co.,* 244 U.S. 261, 263, 37 S.Ct. 509, 510, 61 L.Ed. 1119 (1917). Since the derivative suit is essentially two causes of action in one—a suit against the third party wrongdoer and a second suit against the corporate directors for their failure to sue—plaintiff must first demonstrate that the directors have wrongfully declined to proceed against the wrongdoer before he can press his claim. Note, "Demand on Directors and Shareholders as a Prerequisite to a Derivative Suit," 73 Harv.L.Rev. 746, 748 (1960). The business judgment rule can thus bar a derivative suit entirely upon a showing that the directors' refusal to sue was in good faith. *See, e.g., Abramowitz v. Posner,* 672 F.2d 1025, Fed.Sec.L. Rep. (CCH) ¶ 98,458 (2d Cir.1982) (Directors' refusal of plaintiff's demand was within the business judgment rule and thus justified termination of a derivative suit alleging violations of Rule 10b–5 under the Exchange Act.); *See also Ash v. International Business Machines,* 353 F.2d 491 (3d Cir. 1965).

■ Defendants in the instant case seek to give the trustees' response to plaintiff's demand binding effect so as to cut off his right to sue; they are thus primarily relying on the business judgment rule, not Rule 23.1. FMR apparently seeks to incorporate the business judgment rule into the demand requirement, however, by arguing that demand would be reduced to a meaningless ritual if the trustees' response was not given conclusive weight as an independent and unbiased business decision. But courts have specifically rejected that line of reasoning. For example, in *Grossman v. Johnson,* the First Circuit noted that whether directors' refusal to sue bars a shareholder's derivative suit under 36(b) is irrelevant to the question of whether a demand is required by 23.1; even if the refusal had no effect, demand would still give directors an opportunity to "study the problem and decide whether to accede, in whole or in part, to the complainant's views." 674 F.2d at 125, Fed.Sec.L.Rep. (CCH) ¶ 98,619 at 93,-071. *See also Markowitz v. Brody,* 90 F.R.D. 542, 560 (S.D.N.Y.1981). The effect of the trustees' decision not to sue FMR here has nothing to do with the question of whether plaintiff has complied with the demand required under Rule 23.1. It is enough that he has brought his complaint to the attention of the trustees and that they have informed him of their decision not to institute suit on the corporation's behalf. Defendants' motion for dismissal because of plaintiff's alleged failure to comply with Rule 23.1 is denied.

■ That leaves the question of whether the trustees' response to plaintiff's demand should prevent him from proceeding with his suit because it is within the business judgment rule. In support of the motion for summary judgment on that issue, defendants submit the affidavit of the chairman of the disinterested trustees. He sets forth facts concerning the deliberations by the special committee reviewing plaintiff's demand in an effort to demonstrate that the decision not to sue and the fee reductions were the products of a reasonable and good faith business judgment.[6] In opposition, plaintiff's counsel submitted his own affidavit claiming that the committee's decision was hasty and ill-considered. Without deciding the propriety of the trustees'

---

**6.** The affidavit says that the committee retained independent counsel, met with plaintiff's counsel, obtained information from FMR and conducted arms-length negotiations resulting in the fee reductions. It took into account applicable legal standards and weighed various business factors before responding to plaintiff's complaint. The disinterested trustees concluded that, in part because of the cost and disruption of litigation, it would not be in the corporation's best interests to sue FMR.

response, I conclude that the motion for summary judgment should be denied, since even the most reasonable decision by the trustees cannot cut off the shareholder at the threshold from pressing a claim under 36(b) of the Act.

The Supreme Court decision in *Burks v. Lasker,* 441 U.S. 471, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979) is controlling on this issue. In that case, the Court said that whether directors' good faith refusal to sue can prevent a shareholder from pursuing a derivative suit depends, first, on whether state law, applied as a matter of federal law, gives the directors the power to terminate such litigation and, second, whether application of state law would be inconsistent with the policies of the federal statute under which suit is brought. The Court held that a state rule allowing directors to discontinue a derivative suit challenging the corporate purchase of commercial paper would not be inconsistent with the Investment Company Act. However, the Court singled out Section 36(b) of the Act as an example of a clear congressional decision not to allow board action in and of itself to cut off derivative suits. 441 U.S. at 484, 99 S.Ct. at 1840. State rules allowing directors' termination of derivative suits in those cases would conflict with the provision in the Act that board action in regard to management fees "shall be given such consideration by the court as is deemed appropriate under the circumstances." 15 U.S.C. § 80a–35(b)(2).

Defendants seek to distinguish *Burks* on the grounds that the case did not involve 36(b), and that it concerned only the directors' power to terminate litigation already begun, not the effect of a refusal to institute suit upon plaintiff's prelitigation demand. First, the Court's remark about 36(b), dictum though it may be, has been taken very seriously by the lower courts, most notably the First Circuit. *See, e.g.,*

*Grossman v. Johnson,* 674 F.2d at 123, Fed. Sec.L.Rep. (CCH) ¶ 98,619 at 93,070. (In light of *Burks v. Lasker,* there are "very serious reasons" for concluding that disinterested directors cannot by themselves terminate a Section 36(b) suit through the good faith exercise of reasonable business judgment); *Markowitz v. Brody,* 90 F.R.D. at 558–559 (*Burks* made it clear that Section 36(b) actions may not be terminated by the board of directors). Second, the timing of a board's response is insignificant.

■ Of course, the trustees' response to plaintiff's demand here was something more than a flat refusal to sue. In that sense, this case is different from *Burks v. Lasker* where directors sought summary termination without giving plaintiff any relief whatsoever. Defendants argue that because the fee reductions reflect the trustees' considered business judgment, plaintiff's complaint should be dismissed.

Both the language and the legislative history of the Act do suggest judicial deference to the decisions of disinterested directors, given a special "watchdog" role in investment company operations which should not be undercut by a court.[7] Courts have, in fact, afforded considerable weight to trustees' decisions in passing on the fairness of advisory fees. *See, e.g., Gartenberg v. Merrill Lynch Asset Management, Inc.,* 528 F.Supp. 1038, Fed.Sec.L.Rep. (CCH) ¶ 89,386 (S.D.N.Y.1981); *Tannenbaum v. Zeller,* 552 F.2d 402 (2d Cir.1977). However, those determinations were made after a trial. Insofar as the issue in the case is the fairness of the revised fee, not simply the conduct of the disinterested directors in deciding on the new fee schedule, it is impossible for me to decide at this early stage whether the trustees here have acted reasonably or whether FMR's fees remain excessive as plaintiff claims. Genuine issues of material fact exist in that regard, making summary judgment inappropriate.

7. For example, the Senate Report on 36(b) says that the section is "not intended to authorize a court to substitute its business judgment for that of the mutual fund's board of directors" nor is it meant to shift the responsibility for managing an investment company from the directors to the judiciary. Directors of the fund have an important role in the management fee area, and their approval of fees should by no means be ignored. S.Rep. No. 91–184, 91st Cong. 1st Sess., Reprinted in 1970 U.S.Code Cong. & Admin.News 4897, 4902–4903.

B. *Proxy Claim.*

■ Defendants seek partial summary judgment on plaintiff's proxy fraud claim on the grounds that plaintiff has not made a demand on the trustees, and that the proxy statement is accurate. Without deciding whether demand is excused, the undisputed facts show that the proxy statement is not false or misleading.

Plaintiff's complaint says that the table of annualized rates on page 8 of the 1982 proxy statement falsely states fee revisions approved by the board of trustees following plaintiff's demand. The table appears in the section describing the proposed new contract with FMR on which the shareholders were to vote. It is identical to the table appearing in the contract itself, attached to the proxy statement as Exhibit A.

But plaintiff says that although the table may accurately reflect the terms of contract, it does not coincide with that which the trustees ratified on October 23, 1981. He points to the affidavit of FMR vice-president Richard Reilly describing the fee limitations approved by the trustees at that time. Plaintiff is comparing apples and oranges, however. The proxy statement schedule sets forth fee limitations for incremental portions of the Trust's average monthly net assets, while the table in the affidavit sets forth the effective fee rate—a rate expressed in terms of total average net assets of the Trust, not just incremental portions. The two tables are simply two different ways of saying the same thing. Moreover, the proxy statement includes the table of effective rates along with the schedule of graduated fee limitations, so it cannot be argued that pertinent information was omitted. Although the effective rate table in the proxy statement is not identical to that in the affidavits, simple arithmetic shows that the proxy statement table is the more accurate.[8] Shareholders voted on the basis of information in the proxy statement, not the affidavit. Defendants' motion for partial summary judgment on the proxy claim is granted.

8. The affidavit table contains effective rate percentages which appear to be rounded off to the nearest fraction of a decimal point.