**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 18-2202**

———————————

ROB STAR, Derivatively and on behalf of all Nominal Defendants, Oldfield
Community Association, LLC, and Oldfield Club, LLC, and on behalf and for
Oldfield Community Association, LLC's and Oldfield Club, LLC's respective
members,

   Plaintiff – Appellant,

  v.

TI OLDFIELD DEVELOPMENT, LLC, TI OLDFIELD OPERATIONS, LLC, by
and through their respective Board of Directors, John Does 1-10, Individually and
as Directors between the time periods 2010-2017, including Phillip Galbreath and
I. William Stolz, III; OLDFIELD HOLDINGS GA, LLC; SF CAPITAL, LLC; SF
OPERATIONS, LLC; JAMIE D. SELBY, Individually and as Managing Member
of Elliot Group Holdings, LLC; ELLIOT GROUP HOLDINGS, LLC;
OLDFIELD COMMUNITY COUNCIL (2013-2015), including Jay Barr and
Richard Price, by and through its respective Board of Directors, John Does 11-20;
OLDFIELD CLUB (2010-2017), by and through its respective Board of Directors,
John Does 21-30, including Jay Barr, Phillip Galbreath and I. William Stolz, III;
OLDFIELD COMMUNITY ASSOCIATION (2010-2017), by and through its
respective Board of Directors, John Does 31-40, including Richard Price, Phillip
Galbreath, and I. Willian Stolz, III; BALD EAGLE PARTNERS LLC; BEP
OLDFIELD, LLC, by and through their respective Board of Directors (John Does
41-50); JAY BARR; RICHARD PRICE; WILLIAM STOLZ, III; PHILLIP
GALBREATH; OLDFIELD COMMUNITY ASSOCIATION, LLC; OLDFIELD
CLUB, LLC,

   Defendants – Appellees.

———————————

**No. 18-2205**

———————————

ROB STAR, Derivatively and on behalf of all Nominal Defendants, Oldfield Community Association, LLC, and Oldfield Club, LLC, and on behalf and for Oldfield Community Association, LLC's and Oldfield Club, LLC's respective members,

        Plaintiff – Appellant,

  v.

TI OLDFIELD DEVELOPMENT, LLC, by and through their respective Board of Directors, John Does 1-10, Individually and as Directors between the time periods 2010-2017, including Phillip Galbreath and I. William Stolz, III; TI OLDFIELD OPERATIONS, LLC, by and through their respective Board of Directors, John Does 1-10, Individually and as Directors between the time periods 2010-2017, including Phillip Galbreath and I. William Stolz, III; OLDFIELD HOLDINGS GA, LLC; SF CAPITAL, LLC; SF OPERATIONS, LLC; JAMIE D. SELBY, Individually and as Managing Member of Elliot Group Holdings, LLC; ELLIOT GROUP HOLDINGS, LLC; OLDFIELD COMMUNITY COUNCIL (2013-2015), including Jay Barr and Richard Price, by and through its respective Board of Directors, John Does 11-20; OLDFIELD CLUB (2010-2017), by and through its respective Board of Directors, John Does 21-30, including Jay Barr, Phillip Galbreath, and I. William Stolz, III; OLDFIELD COMMUNITY ASSOCIATION (2010-2017), by and through its respective Board of Directors, John Does 31-40, including Richard Price, Phillip Galbreath, and I. Willian Stolz, III; BALD EAGLE PARTNERS LLC; BEP OLDFIELD, LLC, by and through their respective Board of Directors (John Does 41-50); JAY BARR; RICHARD PRICE; WILLIAM STOLZ, III; PHILLIP GALBREATH; OLDFIELD COMMUNITY ASSOCIATION, LLC; OLDFIELD CLUB, LLC,

        Defendants – Appellees.

---

Appeals from the United States District Court for the District of South Carolina, at Charleston. David C. Norton, District Judge. (9:17-cv-02489-DCN)

---

Submitted: March 26, 2020             Decided: June 10, 2020

---

Before AGEE, THACKER, and RUSHING, Circuit Judges.

---

Affirmed in part and dismissed in part by published opinion. Judge Agee wrote the opinion, in which Judge Thacker and Judge Rushing joined.

––––––––––––

Denise L. Savage, SAVAGE LAW, PLLC, Beaufort, South Carolina, for Appellant. Merritt G. Abney, Matthew W. Orville, NELSON MULLINS RILEY & SCARBOROUGH, LLP, Charleston, South Carolina, for Appellees TI Oldfield Development, LLC; TI Oldfield Operations, LLC; SF Operations, LLC; SF Capital, LLC; Oldfield Holdings GA, LLC; I. Williams Stolz; and Phillip Galbreath. Ian S. Ford, Ainsley F. Tillman, FORD WALLACE THOMSON LLC, Charleston, South Carolina, for Appellees Oldfield Club and its Post-Turnover Board of Directors. Krista M. McGuire, A. Smith Podris, PARKER POE ADAMS & BERNSTEIN LLP, Charleston, South Carolina, for Appellees Oldfield Community Council, LLC; Richard Price; and Jay Barr. Joseph E. DaPore, Russell G. Hines, YOUNG CLEMENT RIVERS, LLP, Charleston, South Carolina, for Appellees Oldfield Community Association, improperly named as "Oldfield Community Association, LLC," and Richard Price and John Does 31-40 in their capacity as community-elected Board Members of the same Post-Turnover. Stephen Bucher, BUCHER LEGAL, LLC, Mt. Pleasant, South Carolina, for Appellee Richard Price, in his capacity as a community-elected member of the Board of Directors for Oldfield Community Association Pre-Turnover. Matthew Tillman, WOMBLE BOND DICKINSON (US) LLP, Charleston, South Carolina, for Appellee BEP Oldfield, LLC. Keri M. Martin, WEINER SHEARHOUSE WEITZ GREENBERG & SHAWE, LLP, Savannah, Georgia, for Appellee Bald Eagle Partners, LLC. Jared H. Garraux, Carmen V. Ganjehsani, RICHARDSON PLOWDEN & ROBINSON, PA, Columbia, South Carolina, for Appellee Oldfield Community Association, LLC, by and through its respective Board of Directors, including Phillip Galbreath and I. William Stolz, III. Thomas C. Taylor, LAW OFFICE OF THOMAS C. TAYLOR, LLC, Hilton Head, South Carolina, for Appellee Jamie D. Selby, Individually and as Managing Member of Elliot Group Holdings, LLC.

––––––––––––

AGEE, Circuit Judge:

After the Boards of Directors responsible for the management of Oldfield, a residential community in South Carolina, filed lawsuits raising claims related to its development, Rob Star, a resident, filed a derivative action alleging similar claims against nearly identical defendants. The district court thereafter dismissed his derivative action for failure to meet the requirements of Federal Rule of Civil Procedure 23.1 and for failure to state a claim under Rule 12(b)(6). In the meantime, the Boards settled their lawsuits.

For the reasons that follow, we conclude the settlements mooted Star's claims insofar as they were related to the ones asserted by the Boards. We therefore dismiss his appeal as to those claims for lack of subject matter jurisdiction. And to the extent Star asserted claims falling outside the scope of those asserted by the Boards' Complaints, we conclude that those claims were either also rendered moot by the settlement agreements or were otherwise properly dismissed by the district court.

I.

To begin, we review the history of Oldfield's development and the competing lawsuits which grew out of events during its development.

A.

Oldfield was created in 2000 by a Declaration of Covenants, Conditions, and Restrictions (the "Governing Documents")—recorded by Oldfield, LLC, the original developer—as a planned community consisting of 540 residences, a golf course, and other

amenities. In turn, the Governing Documents created two not-for-profit limited liability corporations to manage Oldfield, each of which is governed by its own Board of Directors. The Oldfield Club (the "Club") operates the golf course and recreational facilities, and collects mandatory social dues from all members of the Oldfield community for the maintenance of non-golf-related recreational facilities.[1] Meanwhile, the Oldfield Community Association (the "Association") is a homeowners' association that conducts all residential property duties and collects mandatory dues from property owners on a monthly basis. A portion of the Association dues also goes to the Club for the maintenance of non-golf facilities.

In 2010, Oldfield, LLC sold or assigned its remaining lots and development rights to TI Oldfield Development, LLC and TI Oldfield Operations, LLC (collectively, "TI Oldfield"). From 2010 until 2015, TI Oldfield had the right, as declarant and sponsor under the Oldfield Governing Documents, to appoint a majority of directors on both the three-member Club and five-member Association Boards. During this period, TI Oldfield appointed three members to each Board, including TI Oldfield principals William Stolz and Phillip Galbreath.

In 2013, TI Oldfield sold or assigned approximately 109 lots to BEP Oldfield, LLC, and its wholly-owned subsidiary, Bald Eagle Partners, LLC (collectively, "BEP Oldfield"). As part of this deal, TI Oldfield also conveyed certain declarant rights to BEP Oldfield.

---

[1] Residents may also apply for an equity golf membership, which is accompanied by additional golf member dues and voting rights with respect to golf facility issues.

These included the right to appoint a member to the Association Board (but not the Club Board) and exemption from the requirement to pay Club dues. Thus, from late 2013 until early 2016, the Association Board consisted of one director appointed by BEP Oldfield (Scott DeCain), two directors appointed by TI Oldfield (Stolz and Galbreath), and two directors elected by the Oldfield community.

In December 2015, TI Oldfield turned over control of Oldfield to the Club and the Association (the "turnover"). In addition, its right to appoint a majority of directors on both Boards expired (though it retained the right to appoint a minority of directors on both). In early 2016, the Club and Association held Board elections; each has since had a majority of Board members elected by the Oldfield community. Specifically, at turnover, the composition of the Association's five-director Board shifted to three community-elected members and two TI Oldfield- and BEP Oldfield-appointed directors.[2] Similarly, the Club's Board increased its number of directors from three to seven, the majority of whom—two community members and four equity golf members—are also community-elected.[3]

B.

---

[2] Further, "at the time of the next annual meeting of the [Association], in the [f]all of 2016," the number of directors was increased to seven, with one appointed by TI Oldfield and six "elected by members." J.A. 685.

[3] In turn, the one TI Oldfield-appointed director, Galbreath, has recused himself from Board decisions involving these lawsuits.

In early 2017, both community-controlled Boards filed separate lawsuits against TI Oldfield, Galbreath, Stolz, and Jaime Selby—previously the general manager of the Club and Association—along with certain entities affiliated with these defendants.[4] [5] Both suits alleged that the defendants in their respective actions engaged in mismanagement during the development and operation of Oldfield prior to the turnover, asserting among other claims breach of fiduciary duty, self-dealing, breach of contract, interference with prospective contractual relations, tortious interference with contractual relations, civil conspiracy and declaratory relief, negligent misrepresentation, negligent and wrongful acts, and a cause of action for preliminary injunction and declaratory judgment. *See* Complaint at 18–29, *Oldfield Comm. Ass'n v. TI Oldfield Dev., LLC,* No. 9:17-cv-794-DCN (D.S.C. March 24, 2017), ECF No. 1-1 (the "Association Complaint"); *see also* Complaint at 7–15, *Oldfield Club v. TI Oldfield Dev., LLC*, No. 9:17-cv-452-DCN (D.S.C. Feb. 15, 2017), ECF No. 1-1 (the "Club Complaint").

The Association's claims may be grouped into three categories: (1) mismanagement of funds; (2) violation of various duties in the sale of the Greeters Store; and (3) divestment of assets in an effort to become judgment-proof.

The first category—mismanagement of funds—concerns the three separate accounts that fund the Association: (1) the General Operating Fund, (2) the Capital Reserve

---

[4] The Club's suit was originally filed in state court in January 2017 (and the Association's in February) but both were subsequently removed to federal court by the defendants.

[5] The Association also named BEP Oldfield and the BEP-appointed Association Board director, DeCain, as defendants.

Fund (which accumulates funding for future repairs and replacement of community assets, such as roads and sidewalks), and (3) the Community Enhancement Fund (which was "to be used for such purposes as the Board determines to be beneficial to the general good and welfare of Oldfield and [fall] outside the [G]eneral [O]perating budget," J.A. 1692). According to the Association Complaint, TI Oldfield and a number of directors failed to appropriately manage these funds. Between 2011 and 2015, the defendants allegedly transferred funds from the Community Enhancement Fund to the Capital Reserve Fund to offset some of the contributions TI Oldfield was required to pay into the Capital Reserve Fund, thereby inappropriately utilizing assets from the Enhancement Fund and creating a shortfall to the Reserve Fund.[6] The Complaint also alleges the defendants failed to make

---

[6] Specifically, the Association's Governing Documents provided that the Association Board could "assess owners for a Community Enhancement and Marketing Fee," J.A. 606, that would be incurred upon "each subsequent transfer of title to a Unit in the Project (i.e., all resales)." J.A. 1692. "The amount of this transfer fee [was] to be determined by the Board and . . . capped at [one percent] of the gross selling price." J.A. 1692. These fees were then to be deposited in the Community Enhancement Fund, which was to be "fully separate from the [O]perating and [R]eserve accounts." Association Complaint at 7. However, according to the Association, the defendant directors—acting at the behest of TI Oldfield—voted to divert the fees permanently to the Capital Reserve Fund. In sum, the Association's Complaint alleged, "[a]ll sources used by the [d]efendants from the [Enhancement Fund] inappropriately amounted to $480,392 between 2011 and 2015." *Id.* at 9.

Meanwhile, the Governing Documents also required "budgeting and funding into [the Reserve Fund] amounts sufficient to meet the projected needs of capital asset replacement." J.A. 552–53. From 2011 to 2015, TI Oldfield was to cover the budget deficits in this Fund. However, during this period, TI Oldfield and the defendant directors failed in two ways to properly fund this account. First, "the amount of money by which they wrongfully offset their obligations with the [Community Enhancement assets] was based on inaccurate and inflated 'projected' [transfer fee] revenue, not the actual realized

8

up a budget deficit in the General Operating Fund. In sum, according to the Association's Complaint, the accounts were underfunded by a total of nearly $2.5 million. In turn, the Association Board increased member assessments by ten percent to address these deficits.

The second category of claims concerns the sale of the Greeters Store, a building at the entrance of Oldfield that serves a variety of community functions. In October 2016, TI Oldfield conveyed the Store to its subsidiary, Oldfield Holdings, which four days later sold it to Elliot Group Holdings, which was founded by Selby. Upon discovering the sale, the Club and Association terminated Selby's employment. According to the Association, both Selby and TI Oldfield knew that the Club and Association had an interest in acquiring the Store as part of the turnover. But—as the Complaint alleges—by acting on the sale of the Store for his own gain, Selby violated the terms of his employment contract. Likewise, the Complaint alleges, TI Oldfield and the named directors violated their obligation to act in good faith to Club and Association members as part of sale negotiations by intentionally failing to bring this sale opportunity to their attention.

---

[transfer fee] revenue." Association Complaint at 10–11. This resulted in a Reserve shortfall of approximately $163,532 from 2011 to 2014. Second, TI Oldfield and the defendant directors relied on an "outdated reserve study that severely underestimated the actual costs necessary to fully account for the [Reserve Fund's] future expenditures" and thereby failed to ensure "that balances would remain sufficient to cover anticipated maintenance, repairs, and replacements of the Common Assets of the community." *Id.* at 11. The Board calculated the "total shortfall to the [Reserve Fund] to be approximately $648,454" between 2011 and 2015. *Id.*

Finally, according to the Association Complaint, TI Oldfield divested itself of assets—such as the Greeters Store—in an attempt to become judgment-proof with respect to any claims that would arise out of the turnover.

The Club Complaint similarly asserts that TI Oldfield, Galbreath, and certain other directors violated their fiduciary duties to the Club and its members by turning over the golf and other country club facilities in deficient condition. These deficiencies included neglected physical facilities; TI Oldfield's limitation of "the number of certain types of memberships to avoid reaching a number that might trigger turnover";[7] an "artificial limiting of certain types of memberships" that caused TI Oldfield "to turn over a club with fewer [equity] members than contemplated by the original transfer documents" and thus "significantly less annual revenue than contemplated," Club Complaint at 4;[8] mismanaged

---

[7] Although not specifically alleged in the Club Complaint, it appears that a number of events could trigger turnover. As pertinent to this allegation, "192 outstanding golf memberships" could trigger turnover, at which point Club members could vote to approve turnover. J.A. 689; *see also* J.A. 674. However, an alternate triggering event was twelve months of positive cash flow, at which point TI Oldfield—at any time and in its own discretion—could initiate turnover; the record indicates that it was fulfillment of this condition "during 2014" that in fact resulted in the turnover of the Club. J.A. 695. (This is in contrast to turnover of the Association, which automatically occurred in December 2015 without community input.)

[8] TI Oldfield had apparently guaranteed at least 250 golf memberships—both equity and non-equity—before conveying title of Club facilities to the Club. Although such transfer of Club facilities was to occur on or before turnover, it was not to occur "'before the sale of at least 250 Golf Memberships' unless approved by [sixty-five percent] of the Club's equity memberships." J.A. 957. However, as the Oldfield Community Council (the "OCC"), a since-dissolved non-profit organization created by Oldfield homeowners to oversee the turnover, observed, "many of the previously sold memberships ha[d] lapsed." J.A. 689.

10

finances; the sale of the Greeters Store to Selby; and divestment of assets in an attempt to become judgment-proof.

## C.

After the Boards filed their respective lawsuits, Star, an Oldfield resident who is a social member of the Association and club member of the Club,[9] moved to intervene in both actions. The district court denied his motions, finding that intervention would be improper because he had failed to demonstrate that the Boards were not adequately representing the interests of membership in their respective actions, and that Star could seek to protect his own individual interests by pursuing a separate lawsuit. Star then filed a derivative action pursuant to Rule 23.1[10]—which is now before us—on behalf of the Club and Association, raising similar claims against nearly identical defendants.

---

[9] That is, not an equity golf member.

[10] This Rule outlines the requirements for the filing of a derivative suit, providing that it "applies when one or more shareholders or members of a corporation or an unincorporated association bring a derivative action to enforce a right that the corporation or association may properly assert but has failed to enforce." Fed. R. Civ. P. 23.1(a). Nonetheless, "[t]he derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of shareholders or members who are similarly situated in enforcing the right of the corporation or association." *Id.*

In turn, it sets forth a number of specific pleading requirements, providing the complaint must:

> (1) allege that the plaintiff was a shareholder or member at the time of the transaction complained of, or that the plaintiff's share or membership later devolved on it by operation of law;
> (2) allege that the action is not a collusive one to confer jurisdiction that the court would otherwise lack; and
> (3) state with particularity:

11

Star's lawsuit was filed against TI Oldfield, BEP Oldfield, certain developer-appointed directors,[11] and Selby. Like the Boards' Complaints, Star's alleged that TI Oldfield misappropriated Oldfield's funds by: (1) repurposing funds from the Community Enhancement Fund to the Capital Reserve Fund, reducing TI Oldfield's contributions to the Reserve Fund; (2) failing to adequately fund the latter; and (3) underfunding the General Operating Account. And like the Association Complaint, Star asserted that as the result of a shortfall of approximately $2.5 million, the Association increased member assessments by about ten percent. Similarly, according to Star, when TI Oldfield sold certain lots to BEP Oldfield, it transferred only its declarant rights—but not the obligation to pay dues to the Club—causing a shortfall in dues that was passed along to members.

Star's Complaint also likewise alleged that TI Oldfield wrongfully converted the Greeters Store for its own use rather than turning it over to the Club and Association, and conspired with Selby to sell the store to the detriment of the Club and Association. Further, Star asserted, TI Oldfield violated the terms of transfer by turning over to the Club a golf

---

(A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and
(B) the reasons for not obtaining the action or not making the effort.

Fed. R. Civ. P. 23.1(b).

[11] However, it did not name DeCain or any directors appointed by BEP Oldfield.

12

facility with failing infrastructure, operational and funding deficits, and fewer equity memberships sold than required to trigger a turnover.[12]

After the Club and Association moved to dismiss Star's action, the district court appointed a Special Master, who reviewed the claims and recommended dismissal. As to Star's first through seventh causes of action, the Special Master concluded they had been asserted by the Boards in their respective actions, and the Boards were therefore "already enforcing the rights asserted" such that the claims were duplicative. J.A. 1359. As a result, Star's derivative suit with respect to these claims failed to meet Rule 23.1(a)'s requirement that such a suit may be only be brought by a shareholder or corporation member "to enforce a right that the corporation or association may properly assert but has *failed to enforce*." Fed. R. Civ. 23.1(a) (emphasis added). And as to Star's eighth through seventeenth causes of action, the Special Master concluded that although they were not duplicative of the Boards' claims, they failed to meet Rule 23.1(b)'s demand requirement because Star failed

---

[12] His Amended Complaint alleged seventeen separate causes of action, which are listed in the order in which they were asserted in Star's Complaint: (1) breach of fiduciary duty; (2) negligence and negligent misrepresentation; (3) breach of contract; (4) tortious interference with contractual relations; (5) civil conspiracy and declaratory relief; (6) quantum meruit; (7) cause of action for preliminary injunction and declaratory judgment; (8) civil Racketeer Influenced and Corrupt Organizations ("RICO") claims for mail and wire fraud; (9) unconscionable contracts subject to modification; (10) ultra vires conduct; (11) conflicts of interest; (12) improper and undisclosed amendment of bylaws; (13) failure to properly maintain and produce records for inspection; (14) failure to report the commenced Club and Association actions to the South Carolina Attorney General; (15) cause of action for appointment of a receiver; (16) a deceptive and inaccurate property report; and (17) theft of services. J.A. 569–88.

to "state with particularity" that he had made a pre-suit demand of the Boards. Fed. R. Civ. P. 23.1(b)(3).

However, the Special Master also concluded that Star had satisfied Rule 23.1 as to a narrow portion of the breach of fiduciary duty and quantum meruit claims against TI Oldfield and BEP Oldfield set forth in Counts One and Six—specifically, the claims related to the agreement in which TI Oldfield sold a number of lots to BEP Oldfield and assigned to it certain declarant rights, yet exempted it from the requirement to pay Club dues. Nonetheless, the Special Master recommended dismissing these claims. As to the claims against BEP Oldfield, the Special Master concluded Star had failed to state a claim under Rule 12(b)(6). As an initial matter, the Special Master found that the fiduciary duty claim failed because Star had not shown that BEP Oldfield owed a duty to the Club or Association "by virtue of its purchase of lots." J.A. 1377. And as to the quantum meruit claim—in which Star alleged that BEP Oldfield received a benefit to the disadvantage of the Club and Association because it had obtained the lots without having to pay Club dues—the Special Master concluded that Star had failed to show that it was the Club or Association that had conferred a benefit to BEP Oldfield. Rather, "BEP [had] entered into a transaction with TI Oldfield[.]" J.A. 1379.

As to the claims against TI Oldfield, the Special Master concluded that the Boards' decisions not to pursue these claims was protected by the business judgment rule, which under South Carolina law "precludes judicial review of actions taken by a corporate governing board absent a showing of a lack of good faith, fraud, self-dealing[,] or

14

unconscionable conduct." *Dockside Ass'n, Inc. v. Detyens*, 362 S.E.2d 874, 874 (S.C. 1987).[13] Here, the Special Master concluded that the only colorable allegations in Star's Complaint "arguably applicable to business judgment are that TI Oldfield controls the boards and their failure to seek the remedies sought by [Star] shows the [B]oards are conflicted from bringing this action." J.A. 1381. However, the Special Master observed, "that TI Oldfield may appoint one, minority director to the [B]oards does not support a finding that it controls them. That the [B]oards chose not to assert [Star's desired remedies] does not show bad faith." J.A. 1381. Thus, the Special Master concluded, the business judgment rule protected the Boards' decisions not to pursue these claims.

The district court adopted the recommendations and dismissed Star's derivative action. Star now appeals.

Following the filing of this appeal, the Club and Association settled their respective actions (with the exception of claims regarding two specific defendants who are not relevant to this case). Among other terms, the settlements conveyed all sponsor and

---

[13] More specifically, this rule presumes that in making a business decision, the officers or directors of a corporation acted in an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company. *See Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). And since it operates as a presumption, a plaintiff must rebut that presumption by pointing to specific instances of conduct that demonstrate the officers or directors were acting in a culpable manner inconsistent with the presumption afforded them by the rule. *See id.*

However, it does not protect all actions taken by corporate officers and directors. For instance, the rule does not apply "where the business decision in question is tainted by a conflict of interest"; is so careless that it amounts to an "abdicat[ion] of [the directors'] functions"; or "results from prolonged failure to exercise oversight and supervision." *See F.D.I.C. v. Baldini*, 983 F. Supp. 2d 772, 780 (S.D.W. Va. 2013).

declarant rights to the Club, conveyed the Greeters Store to the Club, and paid the Association $1.25 million. Further, the settlements ended the ongoing litigation, containing broad releases providing that:

> The Parties hereby release and forever discharge each other and their respective agents, servants, representatives, legal counsel, directors, officers, shareholders, successors-in-interest (by merger or otherwise), assigns, affiliates . . . , related entities, corporate parents, corporate subsidiaries, employees, former employees, members, managers, administrators, and representatives, from any and all demands, actions, claims or rights to compensation, known or unknown, which they had or now have in connection with or in any way related to Oldfield (including actions occurring before or after Turnover), Turnover, the Subject Matter or any other matters pled or that could have been pled by the Parties against one another in the Civil Action.

Club Settlement Agreement at 7, *Star v. TI Oldfield*, No. 18-2202 (4th Cir. Dec. 21, 2018), ECF No. 62-1 (the "Settlement Agreement"); *see also* Association Settlement Agreement at 4–5, *Star v. TI Oldfield*, No. 18-2202 (4th Cir. Dec. 21, 2018), ECF No. 62-1 (providing substantially the same). The Club and Association then dismissed the two actions with the stipulation of the other parties. The dismissals were with prejudice as to all of the Club's and the Association's claims except for those against Selby and Elliott Group Holdings, which were dismissed without prejudice.[14] The Association then assigned its claims against

---

[14] Star moved to enjoin the dismissals and effectuation of the settlement agreements. The Special Master recommended the district court deny Star's motions to enjoin the settlement agreements, finding that the parties' stipulations of dismissal deprived the court of jurisdiction over the Club and Association actions (and that, even if Star had established standing to challenge the settlement agreements, his argument for an injunction lost on the merits). Star did not object to the report and recommendation, which the district court adopted, denying Star's motions to enjoin the settlements. Star did not appeal that order.

Selby and Elliott Group Holdings to the Club, which has since litigated, settled, and dismissed those claims in state court.

The Boards and the defendants then moved to dismiss Star's appeal, contending the settlement agreements had rendered it moot.

## II.

We turn first to the question of whether the settlements have mooted Star's appeal such that this Court lacks subject matter jurisdiction.[15] In arguing that his claims are not moot, Star takes issue with the validity of the settlement agreements by contending they are the results of negotiations by Boards with a conflict of interest—specifically, that they are controlled by TI Oldfield—thereby raising issues central to the dismissal of his action.

---

[15] Two preliminary matters raised by Star warrant mention. As an initial matter, Star contends that the motions to dismiss should be denied because the Club, the Association, and TI Oldfield failed to comply with Fourth Circuit Rule 27(a), which provides that "all motions [in counseled cases] shall contain a statement by counsel that counsel for the other parties to the appeal have been informed of the intended filing of the motion." We conclude this argument is without merit, as mootness is a jurisdictional issue that this Court must address "irrespective [of] whether the issue was raised by the parties, when [its] jurisdiction is fairly in doubt." *Williams v. Ozmint*, 716 F.3d 801, 809 (4th Cir. 2013).

Star's invocation of the voluntary cessation doctrine is similarly unavailing. "[I]t is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Deal v. Mercer Cty. Bd. of Educ.*, 911 F.3d 183, 191 (4th Cir. 2018). And here, the doctrine is inapplicable because rather than ceasing the challenged actions of their own accord, the defendants contractually bound themselves to change their conduct through the settlements.

17

It has long been established that if "a live case or controversy ceases to exist after a suit has been filed, the case will be deemed moot and dismissed for lack of standing." *Pender v. Bank of Am. Corp.*, 788 F.3d 354, 368 (4th Cir. 2015).[16] A case "becomes moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Williams,* 716 F.3d at 809. "A change in factual circumstances can moot a case on appeal, such as when the plaintiff receives the relief sought in his or her claim, or when an event occurs that makes it impossible for the court to grant any effectual relief to the plaintiff." *Id.*

As an initial matter, we observe that this Court has not specifically considered whether a company's settlement of a similar action renders a derivative action moot, particularly when the derivative plaintiff asserts that the settlement was entered by a conflicted board. However, we are cognizant of the (1) more general caselaw stating that corporations own any claims arising out of injury to the corporation, and thereby have the absolute right to resolve them (short of a conflict of interest on the part of the board), *see, e.g.*, *Clark v. Lomas & Nettleton Fin. Corp.*, 625 F.2d 49, 52 (5th Cir. 1980) (observing that the claims set forth in a derivative suit "belong not to [shareholders] but to [the corporation]" and thus it is generally left to the corporate directors to decide "whether to enforce corporate rights of action"); and (2) more specific, albeit limited, precedent concluding that settlement of a corporation's related suit may render a derivative

_____

[16] We have omitted internal quotation marks, alterations, and citations here and throughout this opinion, unless otherwise noted.

18

proceeding moot so long as the board is disinterested, *see Salovaara v. Jackson Nat'l Life Ins. Co.*, 246 F.3d 289, 296 (3d Cir. 2001) ("A corporation may enter into a settlement despite the existence of a derivative action when doing so is in the corporation's best interest."). We therefore conclude that the settlements here have rendered most of Star's appeal moot.

At the outset, we agree that the Club and Association Boards "owned" the claims against the TI Oldfield defendants[17] and had the absolute right—short of a conflict of interest on the Boards—to resolve them in the manner they saw fit. This authority is such that even if the Boards had declined to bring their own suits and Star's derivative suit was the only action pending that arose out of the allegations at issue, the Boards would generally have the power to settle the derivative suit. After all, "courts have repeatedly held that corporate directors are empowered to abort putative shareholder derivative suits, when it is their business judgment that the cause ought not be enforced. Correlatively, corporate

---

[17] Under South Carolina law,

> Generally, a shareholder of a corporation has no standing to assert legal claims based on harm to the corporation. Although the shareholder is indirectly harmed by any harm to the corporation, only the corporation itself may bring an action to redress this harm. Normally a corporation would act through its officers and directors, but in cases where the officers and directors wrongfully refuse to assert the corporation's rights or have conflicts of interest, a shareholder may bring an equitable "derivative" action in the name of the corporation.

*Bowen v. Houser*, No. 3:12-cv-173-MBS, 2012 WL 2873873, at *2 (D.S.C. July 13, 2012). "In essence, a derivative action is one in which the right claimed by the shareholder is one the corporation could itself have enforced in court." *Id.*

19

directors possess inherent authority to compromise such suits." *Clark*, 625 F.2d at 52; *see also Wolf v. Barkes*, 348 F.2d 994, 997–98 (2d Cir. 1965) ("The corporation's interest in achieving a favorable settlement does not cease because derivative litigation has begun[.]"); *Kahn v. Kaskel*, 367 F. Supp. 784, 789 (S.D.N.Y. 1973) ("There is nothing in Rule 23.1 which in any way prohibits a corporation from making an out-of-court settlement and giving a general release merely because a derivative action, brought on its behalf, is pending in a federal court."). "As with other management functions, however, the power to control corporate litigation presupposes that the directors have no interest in its exercise." *Clark*, 625 F.2d at 52.

However, this Court has not addressed the more nuanced issue of whether a plaintiff's derivative action on behalf of an entity is rendered moot by the entity's settlement of the same or similar claims in another action. In support of their respective positions, both parties point to *Clark*, in which shareholders brought a derivative action on behalf of a corporation, which the corporation subsequently settled without the plaintiffs' knowledge. *Id.* at 51. The district court upheld the settlement over the plaintiffs' objections, but the Fifth Circuit vacated it. As an initial matter, the Fifth Circuit observed that although corporate boards have the "inherent authority" to settle derivative actions, such authority exists only when the boards are disinterested. *Id.* at 52. The court then considered the settlement in the context of caselaw concerning the demand requirement of Rule 23.1, which generally holds that "shareholders may sue derivatively, without first demanding that the directors enforce the corporate cause, when the circumstances would render such

demand a futile gesture." *Id.* at 53. And because the corporation's controlling shareholders were defendants in the action, *Clark* concluded that the board was conflicted, demand would have been futile, and thus the corporation's directors were "incompetent . . . to [settle] all of [the plaintiffs'] derivative claims." *Id.* at 53–54. Although *Clark* provides some guiding principles—namely, that settlement of derivative suits by a board is generally permissible so long as the board is not conflicted—it is not entirely on point because the Boards in the cases at bar settled their own respective actions.

*Salovaara* offers more specific guidance. There, a shareholder appealed the district court's dismissal of a derivative action he had brought on behalf of a number of investment funds against a life insurance company. On appeal, the insurance company argued the derivative action was moot because it had since settled any outstanding claims with the funds' directors. 246 F.3d at 295. The insurance company observed that the funds' directors "voluntarily and knowingly surrendered their right to recover damages from this appeal" and "that because none of the [funds'] officers or directors were named as defendants in this lawsuit, there is no reason to suspect an internal conflict of interest led the [funds] to settle this lawsuit for improper reasons." *Id.* at 296. The funds agreed.

In considering whether the appeal had been rendered moot, the Third Circuit observed that "[a] corporation may enter into a settlement despite the existence of a derivative action when doing so is in the corporation's best interests" and there is no

conflict on the part of the corporate directors entering the settlement. *Id.*[18] In considering whether the settlement was in the funds' best interest, the Third Circuit noted the insurance company and the funds had argued that the benefits to the funds included resolution of litigation, the limitation of any potential exposure to liability, and a recovery of $19 million. In turn, the insurance company "maintain[ed] that it [was] not in the [funds'] best interests to continue with this derivative suit, given the benefits it ha[d] received from the settlement." *Id.* But according to the shareholder, the insurance company had only provided conclusory statements that the settlement was in the funds' best interest and that this did not necessarily demonstrate a lack of collusion on the part of the funds' directors in reaching the settlement. (Namely, the shareholder suggested that a single fund director had a conflict of interest that prevented him from entering into a fair settlement agreement.)

The Third Circuit concluded that in considering mootness, it was not required to accept the settlement agreement at face value. Rather, it had the equitable power—"if the circumstances so warrant"—to review the settlement while a derivative suit was pending for reasonableness and to enjoin the corporation from entering into it, either temporarily or permanently, if it was "not in the best interests of the company." *Id.* at 297. Thus, the court could evaluate the settlement agreement in the first instance under a deferential

_____

[18] This standard was derived from *Wolf*, 348 F.2d at 997, in which the Second Circuit held that then-Rule 23(c) regarding notice to class members of a class action settlement did not forbid a corporation from settling its claims out of court during the pendency of a stockholder plaintiff's derivative class action. *Id.* That court left the door open to review the propriety of settlement agreements in situations where "the beneficiaries of the alleged improper dealing still dominated the board of directors and plaintiffs were able to make some proof that wrongdoing was afoot." *Id.* at 998.

"reasonableness" and "best interests of the company" approach. *Id.* After conducting such a review, the court concluded that on the present facts, it did not see anything "trigger[ing] a need for further scrutiny[.]" *Id.* The conflict the shareholder attributed to the single fund director—a falling out with the shareholder—was "tenuous," given that the director at issue controlled less than five percent of the fund's assets. *Id.* And there were no other demonstrations of improper collusion or bad faith. Further, there were specific reasons, noted above, as to why the settlement was in the best interests of the funds. Upon concluding the agreement passed muster, the court dismissed the shareholder's appeal as moot, observing that he could "always file a new lawsuit against [the funds] if he believes it breached a duty towards the shareholders by entering into the Settlement." *Id.*

We see no reason why *Salovaara*'s framework and reasoning should not apply to the settlements at issue here—that is, why settlements that are in the best interests of the company, entered by a disinterested board, should not moot a related derivative suit asserting identical or similar claims arising out of the same underlying facts. As an initial matter, it appears that the settlements are in the best interests of the Club and the Association. Among other terms, the settlements: (1) convey all sponsor and declarant rights to the Club; (2) convey the Greeters Store to the Club; and (3) pay the Association $1.25 million. They also end the ongoing litigation.

In turn, there is no evidence of collusion in the negotiation of the settlement agreements or any cognizable conflict of interests on the part of the Boards. To the extent Star asserts conflicted Boards, it appears that only one Board director—Galbreath, who is

23

appointed by TI Oldfield—is a named defendant. (In turn, as discussed above, Galbreath recused himself from Board decisions involving this litigation.) *Cf. Clark*, 625 F.2d at 51 (concluding that because controlling shareholders were defendants, the board was conflicted). Further, it is undisputed that since 2016, the majority of each Board has been comprised of community-elected members. Specifically, following turnover, the Association's Board consists of five directors, most of whom—at least three—are community-elected.[19] In turn, the Club's consists of seven directors, the majority of whom—two community members and four equity golf members—are also community-elected. The record contains no evidence that either of the Boards during the litigation or settlement negotiation was controlled by TI Oldfield or any of the other defendants. Thus, under both *Clark* and *Salovaara*, Star's assertion of a conflict of interest as to either Board is without merit, and we fail to observe anything "trigger[ing] a need for further scrutiny[.]" *Salovaara*, 246 F.3d at 297; *see id.* (concluding allegedly conflicted director could not demonstrate conflict of interest because he controlled less than five percent of assets). In sum, given that the settlements appear to be in the best interests of the Club and Association and there is no demonstration of improper collusion or bad faith, we conclude the settlement agreements are valid and thereby moot the derivative suit insofar as Star's claims were covered by the scope of the Boards' Complaints. Consequently, we lack

---

[19] The record indicates the Association Board may now consist of seven directors, but either way, it is undisputed that the majority are community-elected. J.A. 685.

24

subject matter jurisdiction to consider Star's appeal as it relates to these claims, and therefore dismiss his appeal as to them.[20]

## III.

### A.

Although most of Star's claims of wrongful conduct against the Club and Association's directors have been rendered moot by the settlement agreements, we observe that some were arguably not covered by the scope of the Boards' Complaints. For that reason, we must look in the first instance to see if these claims have been otherwise rendered moot by the settlement agreements.

As an initial matter, we conclude that given the broad language of the release in the settlement agreements, these claims were rendered moot. In the alternative, we affirm the district court's dismissal of these claims on either the basis that they failed to meet Rule

---

[20] For the same reasons, we conclude the settlement of the Club's claims against Selby and Elliott Group Holdings in the state court action renders Star's appeal of his claims against those defendants moot.

As part of the state court settlement, the Club paid an agreed-upon amount to Selby; Selby and Elliott Group Holdings conveyed the Greeters Store to the Club; the Club forgave Selby and Elliott Group Holding's mortgage on the property; and the parties agreed that any employment agreement or other obligations regarding Selby's employment were acknowledged to be null and void. Further, the parties fully released each other from all related legal claims.

Given that: (1) Star's claims against Selby and Elliott Group Holdings were covered by the scope of the Club's claims; (2) the settlement agreement appears to have been in the best interests of the Club (and obtained the very relief that Star sought—specifically, conveyance of the Greeters Store to the Club); and (3) there has been no demonstration of improper collusion or bad faith in reaching the agreement, we conclude the state court settlement moots Star's derivative suit as to Selby and Elliott Group Holdings.

25

23.1's demand requirements or that the Boards' decision not to assert these causes of action was protected by the business judgment rule. *See Thigpen v. Roberts*, 468 U.S. 27, 30 (1984) ("[W]e may affirm on any ground that the law and the record permit and that will not expand the relief granted below."). Finally, we conclude that a set of allegations asserted by Star against the OCC has also been rendered moot by the settlement agreements or fails to state a claim against the OCC.

B.

We first consider the ten claims asserted against the TI Oldfield defendants that were not asserted by the Boards in their respective lawsuits (namely, Star's eighth through seventeenth causes of action). Given that these allegations stem from alleged impropriety that related to the turnover, we conclude they are rendered moot by the broad language of the settlements releasing any claims related to the "Turnover . . . or any other matters pled or that could have been pled by the Parties against one another in the Civil Action." Settlement Agreement at 7.

In the alternative, we agree with the Special Master's conclusion that these claims failed to satisfy Rule 23.1's demand requirements and affirm the dismissal of these claims based on that failure. *See Rivers v. Wachovia Corp.*, 665 F.3d 610, 616 (4th Cir. 2011) (observing that a derivative action that does not meet Rule 23.1's requirements must be dismissed). In evaluating a derivative claim, a federal court must determine the adequacy of pleading under federal law but determine the sufficiency of the pre-suit demand under the substantive law of the state of incorporation—here, South Carolina. *Kamen v. Kemper*

26

*Fin. Servs., Inc.*, 500 U.S. 90, 108–09 (1991). Under South Carolina law, a demand must at a minimum identify the alleged wrongdoers, describe the factual basis of the wrongful acts and the harm caused to the corporation, and request remedial relief. *Carolina First Corp. v. Whittle*, 539 S.E.2d 402, 410 (S.C. Ct. App. 2000).

With this standard in mind, we briefly consider why each of these non-duplicative claims failed to satisfy Rule 23.1's demand requirements. As an initial matter, the Special Master concluded that Star's eighth cause of action, his RICO claim, failed to fulfill Rule 23.1 because his demand consisted only of his motion to intervene. But as the Special Master correctly observed, "[a] post-suit demand simply does not meet [Rule 23.1's] procedural prerequisite" of demand upon the Boards. *In re Sapient Corp. Derivative Litig.*, 555 F. Supp. 2d 259, 263 (D. Mass. 2008); *see also Wencoast Rests., Inc. v. Chart Capital Partners, L.P.*, No. 2:05-1650-18, 2006 WL 490101, at *3 (D.S.C. Feb. 28, 2006) ("Since [Rule 23.1's] demand requirement is designed to give the directors an opportunity to take the action requested by the shareholder prior to suit, a post-suit demand likely would not suffice. Accordingly, most of the evidence of . . . post-suit demands . . . is irrelevant."); *cf. Kamen*, 500 U.S. at 96 ("The purpose of the demand requirement is to afford the directors an opportunity to exercise their reasonable business judgment and waive a legal right vested in the corporation in the belief that its best interests will be promoted by not insisting

on such right.").[21] Similarly, with respect to his ninth cause of action—which sought modification of the Governing Documents and transfer agreements on the basis that they provided TI Oldfield and BEP Oldfield with control over the Boards, thereby amounting to contracts of adhesion—the Special Master concluded Star failed to fulfill the demand requirements because his only demand allegation was "that he demanded it by way of his motion to intervene." J.A. 1369. Altogether, we discern no error in the Special Master's analysis and affirm the dismissal of both of these claims.

As to Star's next five causes of action, we agree with the Special Master's conclusion that Star failed to make a particularized demand upon the Boards. Star's tenth cause of action sought "damages from various acts of ultra vires conduct of the director Defendants." J.A. 1369. Although he alleged "repeated demands . . . made by [him] and other [community] members . . . to pursue certain present and former board members," the Special Master concluded "[t]his is not a sufficiently particularized allegation of a demand because it does not describe the factual basis of the wrongful acts, harm to the corporation, or relief sought." J.A. 1369. We agree that such failure to state with particularity the harm to the Club and Association does not meet Rule 23.1's demand requirements. Next, Star's eleventh cause of action asserted a host of conflicts of interest on the part of all defendants—such as "fail[ure] to commence breach of fiduciary duty actions against post

---

[21] To the extent that Star references a RICO claim in the Club Board meeting minutes, we also agree with the Special Master's conclusion that this fails to satisfy Rule 23.1's particularity requirements because it does not state the factual basis of any wrongful acts or harm caused to the Club.

Turnover [Club and Association] directors arising from their willful financial negligence," J.A. 582—in violation of S.C. Code § 33-31-831. But as the Special Master correctly concluded, Star failed to allege that he demanded the Club or Association pursue these claims. And we likewise conclude that Star's twelfth cause of action—improper and undisclosed amendment to the Club bylaws,[22] in violation of S.C. Code § 33-31-1021, asserted against all director defendants—failed to allege that he demanded the Club or Association take any action related to this purported amendment.[23] And as to Star's thirteenth cause of action, Star asserted that the directors failed to properly maintain and produce certain records over the course of the Turnover, such as "accurate accounting of utilization of funds by and between" the Club and Association. J.A. 535. The Special Master concluded this claim failed to satisfy Rule 23.1 because it did not state the harm caused to the Club or Association "from not providing an accurate accounting." J.A. 1371. We agree. Finally, with respect to Star's fourteenth cause of action, he asserted that all defendants were responsible for the alleged failure to report the Club and Association's actions to the South Carolina Attorney General pursuant to S.C. Code § 33-31-170.

---

[22] Specifically, Star alleged that in 2013, the Club bylaws were amended so that Club member dues could be applied to the upkeep of Club facilities, and that this amendment was passed by the Board "without notice or an opportunity for the members to vote on it." J.A. 1371.

[23] Although Star cited an email to the Club Board asking for a copy of the amendment, as well as Board minutes stating that he wanted to bring a case related to a pattern of fraud based on unilateral modifications to a set of unspecified documents, "[the email did] not ask [the Club] to rescind or produce an amendment—the relief apparently sought in this cause of action." J.A. 1371. Given the failure to request such relief, we agree with the Special Master's view that the purported demand failed to meet the particularity requirements set forth by South Carolina law.

29

However, as the Special Master correctly noted, Star failed to fulfill the demand requirement because he did not allege that he demanded the Club or Association report their actions. For these reasons, we affirm the dismissal of these claims.

Next, Star's fifteenth cause of action sought the appointment of a receiver to engage in oversight of TI Oldfield, BEP Oldfield, and the Boards to ensure "accurate accounting, retention of assets, and credible reports of Oldfield's operations." J.A. 1372. The Special Master again correctly concluded Star had failed to fulfill Rule 23.1 because the only demand that Star alleged was through his motion to intervene, which, as discussed above, was insufficient. Likewise, Star's sixteenth cause of action—asserting that TI Oldfield violated Title XIV of the Housing and Urban Development Act of 1968 (the "Interstate Land Sales Full Disclosure Act"), 15 U.S.C. § 1701 *et seq.*, by filing an allegedly deceptive and inaccurate federally-mandated property report—failed to meet the demand requirements because his only allegation of demand was made by way of his motion to intervene. We therefore affirm the dismissal of these claims.

Finally, as to his seventeenth cause of action, Star asserted a claim for theft of services. This claim arose out of TI Oldfield's use of revenue generated from non-member utilization of Oldfield facilities (such as for weddings and golf) to breakeven on operational funds and offset its obligation to pay deficits. In his claim, Star argued that all such funds should have gone to the Club and Association. And although he alleged demand in the form of emails from other community members to the Boards stating that TI Oldfield's use of the revenue was "illegal" and amounted to "theft of services," he failed to cite any

30

communications that he himself made. J.A. 1373. Because Rule 23.1 requires that the named derivative plaintiff make the demand,[24] Star failed to meet Rule 23.1's demand requirements. In sum, to the extent these ten claims were not covered by the settlement agreements, we affirm the district court's dismissal of these claims for failure to satisfy Rule 23.1.[25]

Nonetheless, even if Star's claims had fulfilled Rule 23.1's demand requirements, we would alternatively conclude that the Boards' decision not to pursue them was protected by the business judgment rule. As noted, this rule "presumes that the board made its decision on an informed basis, in good faith and in the honest belief that the action was taken in the best interests of the company." *Morefield v. Bailey*, 959 F. Supp. 2d 887, 897 (E.D. Va. 2013). And in South Carolina, this rule "precludes judicial review of actions taken by a corporate governing board absent a showing of a lack of good faith, fraud, self-

---

[24] Given that Rule 23.1 refers to "the plaintiff" in three instances—that "the plaintiff" fairly and adequately represent shareholder interests; allege he was a shareholder at the time of the transaction; and make the demand, Rule 23.1(a), (b)(1), (b)(3)(A)—these requirements would be rendered meaningless if "the plaintiff" meant every member or shareholder. If this were the case, any member "would always fairly and adequately represent the shareholder" and satisfy the requirement that he or she be a shareholder at the time of the transaction. J.A. 1374–75. Given this, the only reasonable reading of Rule 23.1 is that the named derivative plaintiff must make the demand.

[25] The district court also correctly concluded that Star failed to show that demand would have been futile. Under South Carolina law, the plaintiff bears the burden of alleging particularized facts in support of the assertion that demand would have been futile. *Carolina First Corp.*, 539 S.E.2d at 411. South Carolina courts have concluded that demand requirements must be rigorously enforced such that conclusory allegations that the alleged wrongdoers "controlled the board" are insufficient to establish futility, absent particularized facts to support it. *Id.* at 412. As the Special Master correctly recognized, Star failed to allege futility at all, much less with particularity.

dealing or unconscionable conduct." *Dockside Ass'n*, 362 S.E.2d at 874. Here, the record indicates that the only possible showing of "a lack of good faith, fraud, self-dealing or unconscionable conduct" would stem from Star's allegations of TI Oldfield's control over the Boards. *Id.* Nonetheless, as discussed at length previously, given that the Boards are controlled by community-elected members, we discern no such conflict of interest or control by TI Oldfield. Further, there is nothing in the record indicating that the Boards' decision not to pursue these claims was made in bad faith or was the result of self-dealing or unconscionable conduct, nor has Star offered any particularized facts indicating to the contrary. Given this, we conclude such a decision not to pursue these claims was protected by the business judgment rule.

## C.

In addition, the Special Master concluded that Star had satisfied Rule 23.1 as to the narrow remaining portion of the breach of fiduciary duty and quantum meruit claims asserted against TI Oldfield and BEP Oldfield, but recommended dismissing them. As to the causes of action against BEP Oldfield, the Special Master concluded Star had failed to state a claim under Rule 12(b)(6). In the fiduciary duty claim,[26] Star alleged that the

---

[26] To assert a breach of fiduciary duty, the plaintiff must establish the existence of a fiduciary relationship. *Steele v. Victory Sav. Bank*, 368 S.E.2d 91, 94 (S.C. Ct. App. 1988). South Carolina law defines a fiduciary relationship as one "founded on trust and confidence reposed by one person in the integrity and fidelity of another." *Id.* at 93. And to establish this relationship, "the facts and circumstances must indicate the party reposing trust in another has some foundation for believing the one so entrusted will act not in his own behalf but in the interest of the party so reposing." *Moore v. Moore*, 599 S.E.2d 467, 472 (S.C. Ct. App. 2004).

"transfer to BEP of only rights but no obligations [to] pay [Club] dues 'removed an estimated 20% of the lots from contributing dues to the [Club]' and resulted in an increase in dues paid by the members." J.A. 1376. However, the Special Master observed that "even accepting all of this," Star had failed to allege or otherwise show that BEP Oldfield owed a duty to the Club or Association "by virtue of its purchase of lots." J.A. 1377. And to the extent BEP Oldfield could appoint a director to the Association (while abstaining from paying dues to the Club), "it [was] unclear how the appointment of a director to [the Association] could result in a breach of fiduciary duty to pay dues to another entity," the Club. J.A. 1377–78. In sum, there was no allegation of any facts supporting the existence of a fiduciary relationship between BEP Oldfield and the Club. And even accepting Star's allegations as true, he had only alleged that BEP Oldfield purchased lots from TI Oldfield, received an assignment of certain rights, and appointed an Association Board director. J.A. 540–41. We agree that this fails to establish a fiduciary relationship under South Carolina law.

As to the quantum meruit claim[27]—in which Star alleged that BEP Oldfield had received a benefit via the transfer of the lots "to the disadvantage" of the Association and Club because it was not required to pay Club dues—the Special Master concluded that Star had failed to demonstrate a benefit conferred by the Club or Association upon BEP

---

[27] The elements of a quantum meruit claim are: (1) a benefit conferred by the plaintiff upon the defendant; (2) realization of that benefit; and (3) retention of the benefit by the defendant under circumstances making it inequitable for him or her to retain it without paying its value. *Gignilliat v. Gignilliat, Savitz & Bettis, L.L.P.*, 684 S.E.2d 756, 764 (S.C. 2009).

Oldfield. Specifically, the Special Master concluded, Star had failed to allege the Club or Association "had anything to do with the purchase transaction or that BEP requested anything from them." J.A. 1379. Rather, BEP Oldfield had entered into a transaction with TI Oldfield. We agree and conclude that even if the settlement agreements did not moot these claims, Star failed to state a quantum meruit claim against BEP Oldfield: Star did not allege that the Association or the Club were involved in the transaction; that BEP Oldfield requested anything from either Board; or that BEP Oldfield did anything to cause the Club to rely upon it for payment of dues or induced the Club in any way.

The Special Master also recommended dismissing the claims against TI Oldfield because the Boards' decision not to pursue such causes of action against TI Oldfield to recover the unpaid dues from BEP Oldfield was protected by the business judgment rule. The Special Master concluded that the only colorable allegations in Star's Complaint "arguably applicable to business judgment are that TI Oldfield controls the [B]oards and their failure to seek the remedies sought by [Star] shows the [B]oards are conflicted from bringing this action." J.A. 1381. However, the Special Master observed, "that TI Oldfield may appoint one[] minority director to the [B]oards does not support a finding that it controls them. That the [B]oards chose not to assert [Star's desired remedies] does not show bad faith." J.A. 1381. We agree and conclude that even if the settlement agreements did not moot these claims, Star has failed to meet his burden of demonstrating that the Boards' decision not to pursue these claims was not protected by the business judgment rule. This decision is therefore shielded from further judicial review.

34

## C.

Finally, we consider Star's claims against the OCC, a since-dissolved non-profit organization created by and comprised of Oldfield homeowners to oversee the turnover. The factual allegations Star sets forth against the OCC assert that it "took no steps to intervene in the destructive activity" by TI Oldfield and BEP Oldfield during the turnover. J.A. 548. TI Oldfield and the Boards argue that these brief mentions of the OCC in Star's Complaint fail to state any claims against OCC. They also point out that the Boards elected not to bring any claims against the OCC, and Star has failed to allege any facts suggesting the Boards' decision should not be protected by the business judgment rule.

We conclude that to the extent Star asserted claims against the OCC with the same underlying factual allegations that were otherwise covered by either of the Boards' lawsuits, (1) the Boards' decision not to sue the OCC was protected by the business judgment rule (for the same reasons discussed above) and/or (2) any claims that could have been asserted were covered by the broad language of the settlements, which discharged claims that could have been brought in relation to any of the parties' "related entities." Settlement Agreement at 7. In the alternative, we also conclude that to the extent that Star asserted claims that were not brought by the Club or Association, Star failed to state a claim against the OCC, warranting dismissal under Rule 12(b)(6). *Ostrzenski v. Seigel*, 177 F.3d 245, 253 (4th Cir. 1999) ("[W]e may affirm the dismissal by the district court on the basis of any ground supported by the record even if it is not the basis relied upon by the district court.").

\* \* \* \*

To the extent Star asserted claims that were not rendered moot by the settlement agreements, we affirm the district court's dismissal of those claims for failure to satisfy Rule 23.1 or to state a claim under Rule 12(b)(6). Further, to the extent the Boards could have asserted such claims but did not do so, we conclude their decision not to pursue them was protected by the business judgment rule.

## IV.

For the reasons set forth above, we dismiss the appeal as to those claims that were rendered moot by the settlements and affirm the dismissal of the remaining claims. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this Court and argument would not aid the decisional process.

*AFFIRMED IN PART; DISMISSED IN PART*